**STATE of Iowa, Appellee,**

v.

**Edward Lee WILLIAMS, Appellant.**

No. 54089.

Supreme Court of Iowa.

April 25, 1973.

Thomas M. Kelly, Jr., Davenport, and Walter D. Braud, Rock Island, Ill., for appellant.

Richard C. Turner, Atty. Gen., Raymond W. Sullins, Asst. Atty. Gen. Edward N. Wehr, County Atty., for appellee.

Heard before MOORE, C. J., and MASON, LeGRAND, UHLENHOPP ,and HARRIS, JJ.

MASON, Justice.

This is an appeal from judgment sentencing Edward Lee Williams to life imprisonment following his conviction by a

Scott County jury of murder in the first degree contrary to section 690.2, The Code. The State's case was tried on the theory the crime had been committed in Scott County, Iowa, whereas Williams defended on the basis the homicide was committed in the state of Illinois by someone other than himself.

A statement of the clashing testimony of the State's witnesses and defendant's witnesses is necessary at the outset. Faye Locke, age 20, who at times shared an apartment with defendant located at 131½ West 16th Street in Davenport, was the State's principal witness. On a Thursday evening, May 8, 1969, Miss Locke and Miss Jearlean Campbell were driven to a tavern in East Moline, Illinois, by Bob Minor and Earl Connor. There, Miss Locke claims a conversation between the decedent, Virgil Slater, and both women resulted in an illicit engagement. She immediately informed defendant by telephone of her pending return to Davenport with Slater.

Slater then drove the women to Freemen's Tap in Davenport, where Miss Locke met the defendant at approximately 11:30 p. m. Miss Locke testified defendant instructed her to direct Slater to the address of 918 Harrison in Davenport and to then leave the car, together with Miss Campbell; he would then rob Slater. Before leaving the Tap she gave defendant a gun that he had purchased for her. The women subsequently followed defendant's instructions and as they were walking away from Slater's car Miss Locke allegedly heard defendant command Slater to "put your hands on the wheel." The women proceeded to the apartment at 131½ West 16th Street; within five or six minutes defendant came to the apartment and declared, "The guy didn't have any money."

Defendant then left but returned twenty minutes later driving Slater's car. Miss Locke gave this account of her reaction: "I went downstairs and I started to get in the right side and I saw a body laying on the floorboard. So I went around to the back on the driver's side and I asked

Eddie Williams what happened. *He said he shot the guy.*" (Emphasis supplied) Defendant and Miss Locke then drove to the Neponset mine pits in Illinois where defendant concealed the body.

On the way back to Davenport defendant called the Davenport police to determine if anyone had heard a shot at 918 Harrison. Miss Locke could not, however, recall the route taken back to Davenport.

When defendant returned Miss Locke to the apartment at about 4:00 a. m. May 9, 1969, he gave her the gun. At approximately 9:00 a. m. that same morning, defendant, Miss Locke and Miss Campbell travelled to Chicago in Slater's car. The three drove back to Davenport the following Sunday, May 11, 1969. On the return trip defendant made two telephone calls, one to the Moline police department and one to the Davenport police department, to determine whether Mr. Slater's car had been reported as missing.

Miss Locke further testified she discovered the gun with which defendant allegedly shot and killed Slater missing from her apartment after a visit by four men, including Bob Minor and Earl Connor. She then reported the disappearance to defendant.

Charles Borgstadt, a detective sergeant for the Davenport police department, testified that on the morning of May 13, 1969, defendant voluntarily told him that early in the morning of May 9, 1969, Bob Minor and a large man described as an Indian came to his apartment to obtain an automobile seat cover. He located the seat cover and accompanied the two men to their automobile, identified as a green Ford, where he observed a body lying on the front floorboard. He then guided the men to the Neponset mine pits in Illinois where they disposed of the body. On cross-examination, Mr. Borgstadt gave this testimony concerning his conversation with defendant:

"Q. And who did he tell you did it? A. He told us that Earlie Connors and

the—This was later. He told us Earlie Connors and Bob Minor had did it.

"Q. Did he tell you where they did it? A. At the rear of 918 Harrison Street.

"Q. And did he tell you whether or not he was present? A. No. Originally he told us that he was at his apartment when they came.

"Q. You say the reason he told you that is that you were going to be able to tie him to the motor vehicle, is that correct. A. That is correct.

"Q. Did he describe this Indian that came with Bob Minor to the house? A. As a large man is all. Of Indian descent."

The witness further testified defendant stated he learned of the circumstances of the killing from Minor and Connor.

According to Hubert Fitzsimmons, a lieutenant detective for the Davenport police department, defendant led the police to Slater's body on May 13.

A fingerprint examiner for the Federal Bureau of Investigation testified on rebuttal that no fingerprints of Earl Connor or Robert Minor were found on the Slater automobile.

Defendant denied he shot Slater. His testimony portrays a fundamentally different situation: he claims Miss Locke approached him at Freeman's Tap and requested his permission to use the apartment at 131½ West 16th Street for the purpose of having illicit sexual relations with Slater. Defendant refused, advising her to take Slater to 918 Harrison where, according to defendant, Miss Locke and Slater had previously engaged in such conduct. After Miss Locke left the Tap defendant discussed robbing Slater with Bob Minor, who defendant believed needed money to pay his rent.

Defendant testified he followed Slater and the two women to the address at 918 Harrison, returned to the Tap and disclosed the location of Slater to Minor. Defendant and Minor went to defendant's apartment to obtain a mask and gloves for Minor. At that time, Miss Locke and Miss Campbell were at the apartment and defendant then received a gun from Miss Locke. Defendant and Minor were driven back to the location of Slater's car by Earl Connor; they arrived at about 12:15 a. m. They found Slater asleep and Connor removed his billfold.

It was decided Slater should be taken back to East Moline, Illinois. Minor drove Connor's car and defendant rode in Slater's car which was driven by Connor. The men next stopped at defendant's home in East Moline. An argument ensued pitting defendant against Minor and Connor. Apparently provoked by Connor's possession of a gun (not certain whether his own or defendant's) defendant brandished a meat cleaver taken from the glove compartment of Slater's car.

At this point defendant's wife, Alice Williams, was noticed coming out of defendant's home. Simultaneously, defendant observed Connor strike Slater, who had become somewhat attentive, and then heard a gun shot. Defendant asserted he did not have possession of the gun but rather was attempting to meet his wife. Connor and Minor departed in Connor's automobile.

Defendant entered the home, discussed the incident with his wife, prepared a letter to be delivered to a police officer and walked out to Slater's car. Slater's body and the gun were lying on the floor. Defendant drove Slater's car to the apartment at 131½ West 16th Street in Davenport and spoke with Miss Locke. He then drove to Neponset, Illinois without Miss Locke, disposed of the body and returned to the Davenport apartment at about 4:00 a. m. Defendant's remaining testimony concerning the trip to Chicago does not conflict with Miss Locke's testimony.

The testimony of Alice Williams substantially corroborates defendant's. Mrs. Williams said that between 12:00 midnight and 2:00 a. m. on Friday, May 9, she ob-

served four men in a 1967 green Ford parked behind her apartment in East Moline, Illinois. As she opened the front door a shot was fired and, except for her husband, the men promptly left in another automobile. She testified defendant followed her into the house and wrote a letter to be delivered by her to a police officer if necessary. Defendant then left in the green automobile.

Jearlean Campbell, Miss Locke's companion on the night of May 8 stated she did not hear the remark "put your hands on the wheel" as she and Miss Locke walked toward the apartment at 131½ West 16th Street.

There was testimony decedent's car was a 1967 green Ford and that the fatal bullet was fired from a gun of the same caliber having the same rifling characteristics as the gun defendant received from Miss Locke.

As his six assignments of error defendant asserts: (1) he was denied effective assistance of counsel because the court denied his motion seeking funds for investigation; (2) he was denied effective counsel when the court overruled his timely motion for continuance; (3) the jury's verdict is contrary to the evidence; (4) the State failed to prove jurisdiction; (5) the court erred in the admission of improper evidence; and (6) the court erred in failing to grant a change of venue.

I. Under his first assignment defendant contends the trial court's denial of funds to secure an investigator violated his right to effective assistance of counsel afforded by Amendment 6 and denied him the guaranty of equal protection of the law under Amendment 14 of the United States Constitution.

Defendant filed application for an order to receive state-furnished funds for investigative purposes more than a month prior to the date defendant's trial was scheduled to commence. He asserted therein two reasons that justified his request:

"1. That the investigation is necessary and imperative for the defendant to adequately prepare for trial and to insure the defendant a fair trial.

"2. That there are certain witnesses whose names are known to the defense counsel, but defense counsel is unable to locate them, and that their testimony is necessary for the defense of defendant."

Three weeks later the trial court overruled the motion, stating:

"That the application is vague and indefinite as to the area to be investigated, the individuals to be employed for such investigation, their number, the cost or rate of pay of said investigators, and the amount of expense which is anticipated will be incurred for such investigation, and it is therefore impossible for the court to make any ruling as to the propriety of said motion and whether or not the denial of the same is also a denial of due process.

"IT IS THEREFORE ORDERED that said motion be overruled.

"Dated at Davenport, Iowa, this 9th day of September, 1969."

The State insists since defendant did not raise his claim of denial of effective assistance of counsel in the trial court he preserved no error for review in this court. We do not agree.

In motion made at the close of the State's evidence and renewed at the close of all evidence defendant asserted there was no direct evidence the crime charged was committed in Scott county; there was no evidence to corroborate the testimony of Faye Locke, an alleged accomplice, that the homicide occurred in Scott county. No other grounds were urged in the motions which were overruled.

However, in motion for new trial defendant alleged he "was denied a fair and impartial trial in this cause because of the refusal of the court to allow defendant to hire a private investigator to investigate certain aspects of the case without formal

application to the court notifying not only the court but the State of Iowa of the areas in which he needed an investigator * * *. [T]he requirement by the Court that * * * [counsel] must inform the Court and the prosecutor of where and who and what * * * [he wants] to investigate violates defendant's rights."

■ Security of the right to a fair trial is as much the aim of the right to counsel as it is of other guaranties of Amendment 6 of the federal constitution— the right of the accused to a speedy and public trial by an impartial jury, his right to be informed of the nature and cause of the accusation, and his right to be confronted with the witnesses against him and to have compulsory process for obtaining witnesses in his favor. United States v. Wade, 388 U.S. 218, 226–227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149.

■ The right to counsel is the right to the effective assistance of counsel, McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763, and an accused is assured under the provisions of section I, Amendment 14 of the federal constitution and sections IX and X of Article I of the Iowa Constitution of this right and the right to receive a fair trial. State v. Kendall, 167 N.W.2d 909, 910 (Iowa 1969), citing authorities.

■ In *Kendall*, 167 N.W.2d at 910, the court approved the following statement which is later repeated in Kime v. Brewer, 182 N.W.2d 154, 156 (Iowa 1970):

" 'Effective' * * * means conscientious, meaningful representation wherein the accused is advised of his rights and honest, learned and able counsel is given a reasonable *opportunity* to perform the task assigned to him." (Emphasis supplied)

■ The right to effective assistance of counsel requires more than a mere formal appointment. It requires appointment of effective counsel and counsel that are afforded "an opportunity" and "time" to

prepare and present their indigent client's case. See United States v. Germany, 32 F.R.D. 421, 423 (D.C.1963), where the court said: " * * * [A] reasonable interpretation of the constitutional requirement that effective counsel must be provided indigent defendants and that said counsel must be provided the 'opportunity' to prepare the case implies something more than 'time.' An essential ingredient to an attorney effectively representing a defendant in a criminal case, when it comes to determining whether that attorney has had an 'opportunity' to investigate and prepare the case, is funds to pay the necessary and essential expenses of interviewing the material witnesses and in viewing the scene of the alleged crime."

■ Assignment of counsel under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case will not satisfy the necessary ·requisites of due process of law. Orcutt v. State, 173 N.W.2d 66, 70 (Iowa 1969).

The foregoing constitutional rights preserved for an accused by both the federal and state constitutions are implemented in Iowa by section 775.5, The Code. Although this statute does not give an accused any greater substantive rights than he previously had, it does make provision for compensation to assigned counsel for personal services he renders in the defense of an indigent accused and payment of such sums as the court may determine are necessary for investigation in the interest of justice.

An enactment covering similar services for federally prosecuted indigents is the Criminal Justice Act (18 U.S.C.A. section 3006A) which "is a means of implementing what the courts have declared to be a constitutional demand (right of counsel) under the Sixth Amendment and its inclusion in the due process clause of the Fourteenth Amendment." Ray v. United States, 367 F.2d 258, 264 (8 Cir. 1966). In the cited case the court noted that the fundamental purpose of the act is to

provide legal assistance to indigent defendants in criminal cases.

The pertinent part of section 775.5 provides:

"Fees for attorney defending. An attorney appointed by the court to defend any person charged with a crime in this state shall be entitled to a reasonable compensation to be decided in each case by the court, including such sum or sums as the court may determine are necessary for investigation in the interests of justice. * * *."

In State v. Hancock, 164 N.W.2d 330, 332 (Iowa 1969) the court interpreted section 775.5 as authorizing payment by the state for the purpose of obtaining an independent analysis of an indigent defendant's handwriting. This language quoted from *Hancock* is appropriate:

" * * * [Section 775.5] lodges limited discretionary power in the trial court to disburse reasonable compensation to an attorney defending an indigent for the purpose of conducting an investigation in the interests of justice.

"In Schmidt v. Uhlenhopp, 258 Iowa 771, 775, 140 N.W.2d 118, 121, and Weaver v. Herrick, 258 Iowa 796, 803, 140 N.W.2d 178, 182, we say section 775.5 contemplates an attorney should not be expected to defend an accused gratuitously. To which we now add it also recognizes a court appointed attorney should not be required to incur personal expenses in preparing and conducting a meaningful and conscientious defense for the accused.

"The statute clearly protects against frivolous, unwarranted claims by restricting payment to those investigations which in the court's judgment are necessary in the interests of justice."

It should be pointed out in *Hancock* defendant-appellant did not elect to argue either denial of due process or equal protection in urging reversal of the trial court's denial of funds to secure a hand-writing expert. The opinion was therefore based on section 775.5. *Id.* 164 N.W.2d at 333.

■ In the case now before the court defendant seeks reversal on the theory he was denied effective assistance of counsel and equal protection. When the allegations urged by him in motion for new trial are examined in the light of the principles expressed herein relating to these constitutional rights it cannot be logically claimed defendant did not preserve the error asserted in his first assignment for review.

Therefore, we turn to the merits of this assignment. The application and order are set out in their entirety supra.

We do not read the court's ruling as requiring defendant to inform the court and prosecutor of the names and addresses of the persons he wanted to investigate. It did suggest that the application was inadequate in not advising the court as to the number of investigators to be employed, the area to be investigated and probable cost or rate of pay. A fair reading of the order suggests a second, more detailed statement would have been met with favorable results. Counsel did not see fit to follow the suggestion.

■ While every criminal defendant who is financially unable to obtain counsel is entitled to appointment of counsel at state expense, not every similarly situated defendant is entitled to appointment of an investigator or to other expert services. Before authorizing such services to be furnished at state expense there must be a finding that they are necessary in the interest of justice.

■■ When counsel requests court authority for the employment of an investigator or experts, he should point out with specificity the reasons such services are necessary. Although counsel has the primary responsibility to determine if such investigative services will be necessary, the proper and effective administration of section 775.5

requires the trial judge to satisfy himself that such services are necessary and to articulate the reasons therefor.

■ In view of the lack of specificity in defendant's application we conclude the trial court could not, on the sole basis of defendant's application, ascertain whether his claim was "necessary in the interest of justice" or was "frivolous and unwarranted." Counsel requested nothing further in connection with his application.

This assignment is without merit.

By reason of the constitutional issues involved trial courts in Iowa would be prudent in familiarizing themselves with the provisions of the Criminal Justice Act as amended October 1970 (18 U.S.C.A. section 3006A), particularly subsection (e), when considering applications under section 775.5, The Code.

II. A determination of the issue raised by defendant's second assignment requires consideration of facts not outlined above. Defendant was arraigned July 29, 1969 but at his request the arraignment was continued until August 12 when defendant applied for state-furnished funds to employ an investigator; that application was denied September 9.

September 5 defendant filed a motion for continuance of trial until an unspecified date in October.

September 9 defendant entered a plea of not guilty. September 22 the court overruled the motion for continuance and the jury trial commenced. A mistrial was declared September 24 and the court ordered that a new trial begin October 13. A second motion for continuance filed October 8 was overruled the following day and the cause was commenced October 13.

Defendant's appellate argument pertains exclusively to the trial court's order overruling his motion for continuance filed September 5. By that motion, defendant sought a continuance from September 22 to the month of October essentially on the ground he would not have sufficient time to complete an investigation to prepare his case. The court found:

"That the facts and circumstances set forth by the defendant are not such to warrant the continuance of this case, and the fact that the State's Material Witness, Faye Locke, who is being held in Scott County Jail, is due to give birth to a child in the very near future, and continuance of this case would necessitate provisions for incarceration of both mother and infant child, militate against a continuance; * * *."

The principal ground upon which the asserted error is based is that defendant's interest should prevail, not the well-being of a witness or the pecuniary interest of the state; that in his case "defendant was forced to trial because of inconvenience to a material witness," and by implication "Scott County's reluctance to be responsible for a hospital bill should Faye give birth to a child while she is in custody." Notwithstanding the reasonableness of defendant's claim, it is difficult to perceive how defendant was prejudiced when trial ultimately commenced October 13.

■ In any event, the grant or refusal of a motion for continuance rests largely in the sound discretion of the trial court and such discretion is very broad. State v. Weiland, 202 N.W.2d 67, 70 (Iowa 1972). However, there are constitutional bounds to that discretion. Orcutt v. State, 173 N.W.2d at 71. This statement of law appears in Orcutt:

" * * * Whether in any case enough time has been afforded for consultation, investigation for witnesses and preparation of the law and facts depends upon the circumstances of the case including the complexity of the factual issues and the legal principles involved." Id.

In the cited case the court dealt at some length with the question of adequacy of belated appointments of counsel. The factual circumstances in the case now before us do not compare with those presented in Orcutt.

■ We are not justified in holding defendant was denied a fair opportunity to prepare his defense or that the refusal of a continuance was an abuse of the court's discretion under the record presented. Counsel must have gained some knowledge of the law and facts as a result of the trial that ended September 24.

The assignment cannot be sustained.

III. Defendant next contends the jury's verdict is contrary to the "manifest weight of the evidence," since the testimony of Faye Locke is the only evidence tending to establish defendant as the victim's assailant. Defendant argues the uncorroborated testimony of Miss Locke, whom defendant contends was his accomplice, cannot sustain a verdict of guilty. He further attacks Miss Locke's credibility and asserts the State effectively coerced her to testify against him.

Defendant constructs this syllogism: Under section 782.5, The Code, a conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect defendant with commission of the offense; only the testimony of Miss Locke, his accomplice, implicates defendant as the perpetrator of the alleged crime; therefore, the evidence adduced by the State is insufficient to permit a conviction.

Defendant does not contest the admission of certain testimony as corroborating evidence, but contends there simply is no evidence to corroborate Miss Locke's testimony. The following principle is appropriate:

"We have frequently said the existence of corroboration is for the court, the sufficiency for the jury. We have also said corroboration need not be 'strong' and need only tend to connect the defendant with the commission of the offense. Furthermore, corroborating evidence may be either circumstantial or direct." State v. Morrison, 183 N.W.2d 696, 698 (Iowa 1971). See also State v. Jennings, 195 N.W.2d 351, 357 (Iowa 1972). It need not be entirely inconsistent with innocence.

■ The corroboration required by section 782.5 need be neither strong nor corroborative of every material matter testified to by an accomplice, being sufficient if the evidence adduced legitimately tends to connect the accused with the commission of the crime charged and thereby lends support to the credibility of the accomplice. State v. Russell, 259 Iowa 1133, 1135–1136, 147 N.W.2d 22, 24; State v. Cornwell, 189 N.W.2d 611, 612 (Iowa 1971); State v. Jennings, 195 N.W.2d at 357 and authorities cited in these opinions.

The trial court defined the term "accomplice" in instruction 20 and stated the applicable law requiring corroboration of an accomplice's testimony. The instruction submitted to the jury the question whether any witness offered by the State was an accomplice. However, the question whether Faye Locke was an accomplice was not submitted by special interrogatory as in *Morrison*. Defendant did not take any objections or exceptions to the instruction as given nor did he request that the question of Faye Locke's being an accomplice be submitted by special interrogatory.

■ The corroboration of an accomplice necessary under section 782.5, The Code, to justify conviction may come from defendant himself in the way of his admissions, declarations, conduct, writings or other documentary evidence. State v. Fletcher, 246 Iowa 452, 458–460, 68 N.W. 2d 99, 102–103; State v. Latham, 254 Iowa 513, 515–516, 117 N.W.2d 840, 842. Of course, tacit admissions by an accused may not be relied on in this connection. See State v. Kelsey, 201 N.W.2d 921, 925–927 (Iowa 1972).

■ The extrajudicial statements of a party to the action, civil or criminal, may be used against him as a quasi-admission coming in as substantive evidence provided they exhibit the quality of inconsistency with the facts now asserted in his plead-

ings and in the testimony relied on by him. 4 Wigmore on Evidence (Third Ed.) section 1048; McCormick on Evidence (Second Ed.) section 262.

As indicated defendant testified the homicide occurred in East Moline, Illinois, while he, Earl Connor and Bob Minor were occupying a car with Mr. Slater. Defendant denied he fired the fatal shot accusing Earl Connor. On direct examination defendant admitted he had given the Davenport police officers at least two signed statements concerning the crime which were at variance with his testimony. Defendant maintained everything he had told the police in the statements was correct except that the homicide took place in East Moline. These statements were not offered in evidence.

However, exhibit 34 was received in evidence in connection with defendant's cross-examination. This exhibit which defendant admitted writing was addressed and delivered to Miss Locke to be used by her and Miss Campbell when called upon to relate their versions of the incident. The exhibit may be accurately described as a step-by-step set of instructions prepared by defendant.

Defendant read this statement into the record which covered something over five pages in the trial transcript. In this statement defendant placed commission of the crime at the rear of 918 Harrison Street.

Obviously, this is inconsistent with defendant's testimony and contradicts that of Alice Williams, a witness offered by defendant.

It constitutes substantive evidence for jury consideration.

In State's exhibit 34 defendant directed the two girls to testify that while they were in back of Freeman's Tap with defendant Bob Minor said he needed some money to pay his rent and asked defendant for his gun which defendant in turn then secured from Miss Locke. It was understood Minor was to rob Slater.

The girls were to describe their trip in Slater's car with the victim, Minor and Connor to the back of 918 Harrison. They were to say defendant was there when they arrived. Miss Locke tried to get defendant to leave the vicinity of the car but he declined to do so because he wanted to watch the robbery. They were to describe how after they got out of the car they heard a shot and defendant came running from the car to them saying, "Earl [Connor] just shot the guy."

The exhibit contains many other inconsistencies with the testimony relied on by defendant at trial.

It is to be remembered there is also the testimony of detective Borgstadt who definitely placed the homicide in Scott county when he testified defendant told him it had been committed "at the rear of 918 Harrison Street."

■ Assuming without deciding, that Miss Locke was an accomplice a jury would be justified in finding that the foregoing admissions when rationally considered legitimately tended to connect defendant with commission of the crime and thus lend support to the credibility of Faye Locke's testimony.

■ On defendant's appeal from criminal conviction based on jury verdict challenging sufficiency of evidence to sustain the verdict we view the evidence in the light most favorable to the State and accept as established all reasonable inferences tending to support action of the jury. It is necessary to consider only the supporting evidence whether contradicted or not.

■ Also, it is for the fact finder, not us, to decide questions of fact and determine credibility of witnesses. And a finding of guilt is binding on this court unless without substantial support in the record. State v. Cartee, 202 N.W.2d 93, 96 (Iowa 1972), and authorities cited.

Defendant's third assignment is without merit.

IV. Defendant cautiously urges the record is devoid of any evidence tending to prove the State of Iowa has jurisdiction of the alleged offense, relying on this court's willingness to dismiss or discount the testimony of Faye Locke. This contention was raised by way of motion for directed verdict at the close of all the evidence. Of course, defendant's claim focuses on the testimony of defendant and his wife and ignores the State's evidence.

The county attorney's information charging defendant wtih murder alleges that the offense was committed May 9, 1969. Section 753.1, The Code then in effect, provides in part:

"Persons subject to laws of state. Every person, whether an inhabitant of this state or any other state or country, or of a territory or district of the United States, is liable to punishment by the laws of this state for a public offense committed by him therein, * * *."

The changes made in this section by the Acts of the Second Session of the Sixty-fourth General Assembly, chapter 1124, section 74, are not material here. See section 753.1, The Code, 1973.

State v. Brooks, 222 Iowa 651, 652, 269 N.W. 875, has this statement:

"It is the well-settled law in this State that the jurisdiction of the district court is limited to offenses committed within the county in which the court is held. Section 13449, Code 1935 [Now section 753.2, Code, 1971]. This statute provides that: 'The local jurisdiction of the district court is of offenses committed within the county in which it is held.'

"Under this statute a conviction cannot be sustained unless the State proves that the crime was committed within the county in which the indictment was returned. * * *." See also State v. Hackett, 197 N.W.2d 569, 570–571 (Iowa 1972).

■ Miss Locke's testimony and defendant's admissions furnish substantial evidence to support the jury's finding the killing of Slater was committed in Davenport, Scott County, Iowa.

This assignment is without merit.

V. In his fifth assignment defendant argues the trial court committed reversible error in admitting into evidence photographs depicting the fatal wound allegedly inflicted on the decedent by defendant, and testimony implying defendant was guilty of bigamy.

■ Defendant claims the photographs of decedent, which showed the fatal head wound, were erroneously admitted into evidence as the resultant passion and prejudice exceeded their probative value and because they were, in fact, irrelevant to any issue in the case.

Defendant's arguments are less than persuasive. The question of admissibility of photographs is fully discussed in State v. Albers, 174 N.W.2d 649, 657–658 (Iowa 1970) where many of our cases are collected and analyzed. See also State v. McClain, 256 Iowa 175, 182–183, 125 N.W.2d 764, 768 and State v. Niccum, 190 N.W.2d 815, 829 (Iowa 1971).

Under the pronouncements made in *Albers* defendant's assignment cannot be sustained.

■ Testimony of Faye Locke suggested defendant was married to both Vicky Williams and Alice Williams at the time of Slater's murder. Defendant argues questions propounded by the State during the cross-examination of Alice Williams were calculated to insinuate defendant was a bigamist or, minimally, to impugn defendant's character. Yet, defendant remained silent throughout the examination eliciting this testimony. Defendant's failure to make timely objection or motion to strike precludes consideration of his claim the trial court erred in admitting the testimony.

■ A failure to assert promptly and specifically an objection to an offer of

evidence at the time the offer is made is a waiver upon appeal of any ground of complaint against its admission. One attempting to exclude evidence, whether the attempted exclusion is by objection or motion, has a duty to indicate the specific grounds to the court so as to alert him to the question raised and enable opposing counsel to take proper corrective measures to remedy the defect, if possible. Harrison v. Ulicki, 193 N.W.2d 533, 537 (Iowa 1972); McCormick on Evidence (Second Ed.) sections 52 and 59; rule 103(a)(1), Proposed Rules of Evidence for United States Courts and Magistrates.

Defendant's assignment in this respect presents nothing for review in this court.

VI. Defendant claims the trial court abused its discretion in not granting a change of venue and consequently he was denied due process of law under Amendment 14 to the United States Constitution.

On October 1, 1969, one week after a mistrial was declared, defendant filed a motion for change of venue. It was defendant's contention the vast news coverage of the trial which commenced on September 22 by the various media made it impossible for defendant to obtain a fair trial in Scott County.

Defendant's motion was supported by his own affidavit and those of three residents of Scott County. The State's resistance to the motion was supported by affidavits of 12 registered voters who were qualified as jurors in Scott County.

In denying defendant's motion the court found no such excitement or prejudice existed in Scott County which would prevent defendant from obtaining 12 fair and impartial jurors for the trial of his cause since there had been no prejudicial or inflammatory news or press reports which would affect the jurors in any manner.

The matter of change of venue was considered in State v. Niccum, 190 N.W.2d at 823–825. State v. Dague, 206 N.W.2d 93,

(Iowa, filed March 28, 1973) is the most recent decision considering the question. We approve again, without repeating, what was said in division I of that opinion.

 An "independent evaluation" of the available facts and circumstances does not reveal the trial court abused its sound discretion in overruling the motion for change of venue.

Defendant's constitutional rights were not violated in the respects urged. He had a fair and impartial trial.

The case is therefore

Affirmed.