**In the Interest of C.L.C. JR., Minor Child,**

**C.L.C. Jr., Minor Child, Appellant.**

**No. 09–1748.**

Court of Appeals of Iowa.

March 30, 2011.

Rachel Antonuccio of Cole & Vondra, L.L.P., Iowa City, for appellant.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, Janet Lyness, County Attorney, and Patricia A. Weir, Assistant County Attorney, for appellee State.

Heard by VOGEL, P.J., and DOYLE and TABOR, JJ.

DOYLE, J.

C.C., a minor, appeals from a juvenile court order adjudicating him to have committed the delinquent acts of carrying a weapon in violation of Iowa Code 724.4(1) (2009) and reckless use of a firearm in violation of section 724.30(4). He claims the juvenile court erred in denying his requests for a private investigator and depositions at the State's expense and finding he committed the delinquent acts beyond a reasonable doubt. He additionally claims the district associate judge should have recused himself from the adjudicatory proceedings. We reverse and remand.

### I. Background Facts and Proceedings.

C.C. was a member of a group of Cedar Rapids teens known as the Hard Body Soldiers. Other members included C.C.'s childhood friends, P.J. and R.G., as well as their friends K.S., A.J., and A.S. On the night of August 5, 2009, the group decided to drive to Iowa City to their friend T.W.'s house. While there, two members of a rival group in Iowa City known as the Broadway Goons showed up. They challenged the Hard Body Soldiers to a fight at a nearby park.

R.G., K.S., and A.S led the way. P.J, A.J., and C.C. followed behind them. As the group approached the park, they could see the Broadway Goons outnumbered them. Someone from the Hard Body Soldiers fired gunshots into the air, and the teens scattered. The Hard Body Soldiers retreated to T.W.'s house and piled into

two different cars with some of their female friends. As they were driving away, members of the Broadway Goons fired shots at them. A neighbor called the police.

The Hard Body Soldiers drove back to A.J.'s house in Cedar Rapids where C.C., P.J., and A.S. spent the night. On the way there, T.W.'s friend, I.D., who was riding with A.J., P.J., and K.S., saw a gun in her friend S.C.'s purse. She told S.C. about the gun and heard S.C. tell someone to "[g]et that gun out of my purse." The gun has not been seen since.

The next day, P.J. sent C.C. text messages saying, "[W]e was on the news, and they tried to say that I was the one that was shooting.... But it's all cool; they can't prove that it was me." Later that day, C.C. texted T.W. that he was "sorry for putting [her] in this situation." He went on, "I wasn't thinking last night. I don't want you to start feeling different about me because of all this bullshit." C.C. then instructed the other members of the group to keep quiet about what had happened.

A police investigation into the shooting led to the detention of C.C.'s friends R.G. and P.J. T.W. was also questioned and threatened with a charge of participating in a riot. All three eventually identified C.C. as the person who had fired the gunshots from their group. On August 31, 2009, C.C. was detained and charged with participating in a riot and disorderly conduct. The petition was later amended to include charges for carrying a weapon and reckless use of a firearm.

At the detention review hearing, District Associate Judge Stephen C. Gerard II found:

> Competent, reliable evidence establishes [C.C.] as the shooter in this case, establishes him as the person transporting other persons to Iowa City to engage in this conduct. I believe he may seek retribution against those who are, in the Court's opinion, telling the truth about what happened that night and that, as long as these situations remain unresolved, the child, the community, and other juveniles are at serious risk.

> The Court orders that [C.C.] remain in detention pending further proceedings.

Following that hearing, C.C.'s court-appointed attorney filed a motion on September 16, 2009, requesting the juvenile court to appoint a private investigator at State expense. The court summarily denied the motion. At the pretrial conference on September 24, the State listed twenty-one witnesses it intended to call at the adjudicatory hearing scheduled for October 12. The court denied C.C.'s prehearing requests to depose those witnesses at State expense.

The case proceeded to an adjudicatory hearing before Judge Gerard, at the beginning of which C.C. admitted to having participated in a riot. The court accepted his admission, and the State dismissed the disorderly conduct charge. Evidence was then presented on the two remaining charges, which centered on the question of which member of the Hard Body Soldiers fired the gunshots at the fight on August 5, 2009.

R.G. was the first member of the group to testify. He stated he did not see who fired the gunshots because they came from behind him. He also denied having seen a gun in anyone's possession that night. Yet R.G. admitted he identified C.C. as the shooter in a written statement he provided to the juvenile court in his own delinquency case "based on what everybody else is saying." He testified he was "worried about the shooting being pinned" on him. R.G. stated he was told by his lawyer, and

by P.J., that he and P.J. would be released from detention if they said C.C. was the shooter.

T.W. testified next. Like R.G., she stated she never saw a gun or who fired it. In response to a question from the prosecutor, she reluctantly testified that C.C. told her he was the shooter. She acknowledged on cross-examination that she had been charged with participating in a riot and part of the reason she was charged was because she was not "giving up the shooter."

The State called P.J. to testify after T.W. P.J. stated that as he and his friends were walking towards the Broadway Goons, he heard one gunshot. He was asked, "And did the gunshot come from the Hard Bodies?" P.J. stated, "Yeah." The prosecutor then asked him, "And who had the gun?" After a long pause, P.J. responded, "Could you ask me another question?" The court recessed the proceedings and asked to see counsel in his chambers.

The hearing resumed on the record with the court providing the following statement:

When the Court took a recess, the Court invited counsel into chambers. Once in chambers and after closing the door, the Court requested that Ms. Antonuccio and her client [C.C.] reconsider the situation that the Court believed they were creating. After watching the witnesses all very reluctantly and having a very hard time, based upon their friendships and associations with the minor child, answering questions truthfully, the Court suggested to Ms. Antonuccio that she speak with her client about simply telling the truth and discontinuing the process of inflicting this terrible emotional distress on his friends.

The Court observed [T.W.] take an approximately three-minute period of time to answer the question about what the minor child said to her about being the shooter. The Court observed [P.J.] crying when confronted with his dilemma of telling the truth, which would implicate his friend, or not telling the truth.

The Court has watched [C.C.] as he has stared down, in the Court's opinion, his friends on the stand, as he intended to communicate to them what his belief was as to their testimony.

C.C.'s attorney responded,

I don't think you asked me to speak to my client; you told me that I needed to tell him to tell the truth. And he has an absolute right to this trial and to an impartial arbitrator in this trial. And for you to tell me that ... he has to tell the truth, which in your opinion means tell everyone that he's the shooter, makes it very clear to me that you cannot be impartial.

The court disagreed, stating,

Well, Ms. Antonuccio, I've already heard evidence; and the evidence I've heard is persuasive, even if I hear no further evidence. I was impartial when I started this trial.... I want to know the truth, too.

And as I have watched the emotional distress that these witnesses have experienced by having to sit here and testify against your client, their friend, I have concerns for those children....

And I did—I do want to correct that I didn't suggest; I said you need to talk to your client about telling the truth.

. . . .

MS. ANTONUCCIO: I think I would like to say further, Your Honor, that this is not the first time that you've told me that I need to tell my client to tell the truth. You've said that to me multiple times ex parte throughout the course of

this proceeding, which already concerned me about your ability to be impartial.

... [I]f this trial continues in front of you, it's a mockery; you've made your decision. You ostensibly said that, that you've heard enough at this point.

THE COURT: Are you asking me to recuse myself?

MS. ANTONUCCIO: I am.

The court called another recess to take the motion under advisement, following which it denied the request, stating:

Having carefully considered the request to recuse, the Court finds that the Court personally will have absolutely no difficulty being fair and impartial and giving due consideration to all of the evidence introduced during the trial. This Court will consider and determine the credibility of the testimony of each witness and make a decision based only upon the facts proved by the State beyond a reasonable doubt.

P.J. resumed his testimony, stating that C.C. had the gun and fired the shots. He denied being intimidated by C.C., but said, "I feel like I've been a snitch; but—I mean, because we had grew up together and that's like family to me." On cross-examination, P.J. denied having seen the gun, though he admitted that he was walking right next to C.C. when it was fired. He also denied having spent the night at A.J.'s house even though other witnesses had said he stayed there.

The State also presented the testimony of D.W., a member of the Broadway Goons. He testified that when the Hard Body Soldiers saw how many Broadway Goons had come to fight, they "turned around and started heading the other way; and I just heard shots fired.... There was four shots, like, Bam! Bam! Bam! Bam!"

He identified C.C. as the person who had fired the shots into the air. However, D.W. acknowledged that in an interview with the police after the shooting, he had stated, "No, I couldn't see [who shot the gun] because it was kind of dark, so I couldn't really see who was shooting the gun."

C.C. moved for a directed verdict at the end of the State's case, pointing to the inconsistencies in the witnesses' testimony and questioning their motivation in pinning the shooting on him. The court denied the motion, and C.C. was called to testify on his own behalf. He denied having been in possession of or firing a gun. He stated that he thought the first shots actually came from the Broadway Goons. C.C. also testified that R.G. told him

the police came at him harsh ... and told him that he was the shooter and that if he wasn't the shooter, he knew who the shooter was, and that he wasn't going to get out of detention unless he told something else.

He stated he told his friends to keep quiet about the fight because he was on probation and "wanted my involvement in the night to be as minimal as possible."

Following the hearing, the juvenile court entered a written order adjudicating C.C. to have committed the delinquent acts of carrying a weapon and reckless use of a firearm. C.C. appeals.

## II. Scope and Standards of Review.

Iowa juvenile delinquency proceedings are not criminal prosecutions, but are special proceedings that provide an ameliorative alternative to the criminal prosecution of children. *In re J.A.L.*, 694 N.W.2d 748, 751 (Iowa 2005). Our review of juvenile delinquency proceedings is de

novo.[1]  *Id.; see also In re J.D.F.*, 553 N.W.2d 585, 587 (Iowa 1996); *In re D.L.C.*, 464 N.W.2d 881, 883 (Iowa 1991).

■■■ We review a court's discovery rulings and decisions whether to grant applications for state-funded investigators for an abuse of discretion. *State v. Gates*, 306 N.W.2d 720, 725 (Iowa 1981); *State v. Barker*, 564 N.W.2d 447, 450 (Iowa Ct. App.1997). We likewise review a court's decision "to recuse or not to recuse itself for an abuse of discretion." *Taylor v. State*, 632 N.W.2d 891, 893 (Iowa 2001).

### III. Discussion.

### A. Recusal.

We begin with C.C.'s claim that the juvenile court judge erred in failing to recuse himself after he stopped the adjudicatory hearing and told C.C.'s attorney to instruct C.C. to tell the truth. C.C. argues the judge's bias and prejudice against him, culminating with that statement, were apparent throughout the proceedings, beginning with the detention review hearing in which the judge stated, "Competent, reliable evidence establishes [C.C.] as the shooter in this case."[2] He also points to the judge's decision to exclude C.C.'s fami-

ly from the courtroom during the adjudicatory hearing while allowing other witnesses' families to be present as evidence of bias.[3] C.C. concludes these "biased statements and actions, both before and during trial, were sufficient to raise questions about the court's impartiality in the mind of a reasonable person."

■■■ " 'A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases.' " *In re Marriage of Ricklefs*, 726 N.W.2d 359, 362 (Iowa 2007) (citation omitted); *see also State v. Mann*, 512 N.W.2d 528, 532 (Iowa 1994) ("There is a constitutional right to have a neutral and detached judge."). However, speculation as to a judge's partiality is not sufficient because there is " 'as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is.' " *Mann*, 512 N.W.2d at 532 (citation omitted). We look to the Iowa Code, as well as the newly revised Iowa Code of Judicial Conduct, for rules governing recusal.

Iowa Code section 232.47(3) states that in a delinquency proceeding, the

1. The State advocates for a more deferential review of sufficiency-of-the-evidence challenges in delinquency proceedings, similar to that employed in criminal cases. *See State v. Hennings*, 791 N.W.2d 828, 832–33 (Iowa 2010) (reviewing sufficiency-of-the-evidence challenge in criminal case for correction of errors at law and viewing "the evidence in the light most favorable to the State"). Although the State's argument is persuasive, as an intermediate appellate court we must follow the precedents of our supreme court. We accordingly deny the State's request to change the well-established review of sufficiency-of-the-evidence claims in delinquency proceedings, most recently articulated by our supreme court in *In re Z.S.*, 776 N.W.2d 290, 292 (Iowa 2009), *abrogated on other grounds by State v. Spates*, 779 N.W.2d 770, 774 n. 2 (Iowa 2010).

2. At oral argument the State asserted this was a finding by the judge that there was sufficient evidence to keep C.C. in detention, and was not a reflection of any predisposition or bias on the judge's part.

3. We note, however, that C.C.'s grandmother was present in the courtroom for the hearing as his guardian. *See* Iowa Code § 232.38(1) ("Any hearings or proceedings under this division subsequent to the filing of a petition shall not take place without the presence of one or both of the child's parents, guardian or custodian. . . ."). Furthermore, the court acted within its authority in excluding C.C.'s other relatives, whom C.C. never identified, from the hearing. *See id.* § 232.39.

child shall have the right to adjudication by an impartial finder of fact. A judge of the juvenile court may not serve as the finder of fact over objection of the child based upon a showing of prejudice on the part of the judge.

*See also* Iowa Code § 602.1606(1) (stating a "judicial officer is disqualified from acting in a proceeding" if the officer "has a personal bias or prejudice concerning a party").

Further guidance can be found in the Iowa Code of Judicial Conduct, which sets forth the following principles in its preamble:

▪ An independent, fair, and impartial judiciary is indispensable to our system of justice.... Inherent in all the rules contained in the Iowa Code of Judicial Conduct are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system.

▪ Judges should maintain the dignity of judicial office at all times, and avoid both impropriety and the appearance of impropriety in their professional and personal lives.

To that end, rule 51:2.11(A)(1) states:

A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances:

(1) The judge has a personal bias or prejudice concerning a party or a party's lawyer....

*See also* Iowa Code of Judicial Conduct 51:1.2 ("A judge shall act at all times in a impartiality of the judiciary, and shall avoid impropriety and the appearance of

impropriety."); 51:2.2 ("A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially."); 51:2.3(A) ("A judge shall perform the duties of judicial office ... without bias or prejudice."). The comments to rule 51:2.11 explain that

[u]nder this rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific provisions of paragraphs (A)(1) through (5) apply. The term "recusal" is used interchangeably with the term "disqualification."

Iowa Code of Judicial Conduct 51:2.11 cmt. 1.

Despite the foregoing rules requiring impartiality and the avoidance of even the appearance of impropriety, our courts' cases have consistently stated "[o]nly personal bias or prejudice is a disqualifying factor, not judicial predilection."[4] *State v. Haskins*, 573 N.W.2d 39, 45 (Iowa Ct.App. 1997); *accord State v. Millsap*, 704 N.W.2d 426, 432 (Iowa 2005). A per se rule has developed that the disqualifying bias or prejudice "must stem from an extrajudicial source and 'result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'" *Haskins*, 573 N.W.2d at 45 (citations omitted); *see also Millsap*, 704 N.W.2d at 432 ("Judicial predilection or an attitude of mind resulting from the facts learned by the judge from the judge's participation in the case is not a disqualifying factor.").

However, the United States Supreme Court stated in *Liteky v. United States*, 510 U.S. 540, 551, 114 S.Ct. 1147, 1155, 127 L.Ed.2d 474, 488 (1994), that it

is wrong in theory, though it may not be too far off the mark as a practical mat-

---

**4.** "Predilection" is defined as a "partiality or disposition in favor of something; a prefer-

ence." American Heritage College Dictionary 1077 (3d ed.1993).

ter, to suggest, as many opinions have, that "extrajudicial source" is the *only* basis for establishing disqualifying bias or prejudice. It is the only *common* basis, but not the exclusive one, since it is not the *exclusive* reason a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as "bias" or "prejudice" because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment.

Accordingly, opinions formed by a judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deepseated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Liteky*, 510 U.S. at 555, 114 S.Ct. at 1157, 127 L.Ed.2d at 491; *see also State v. Jacobs*, 644 N.W.2d 695, 699–700 (Iowa 2001) (quoting *Liteky* with approval).[5]

■ Although the judge's statements in this case were imprudent, as they suggested he had decided the case before listening to all of the evidence,[6] we do not believe C.C. showed the judge held "such a high degree of ... antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555, 114 S.Ct. at 1157, 127 L.Ed.2d at 491; *see also United States v. Burnette*, 518 F.3d 942, 945 (8th Cir.2008) (finding judge's comment at sentencing that he believed defendant had lied was not basis for recusal); *State v. Farni*, 325 N.W.2d 107, 110 (Iowa 1982) (holding judge's statement at bond review hearing that defendant was "obviously guilty of something" was based on minutes of testimony and, though illadvised, did not constitute an abuse of discretion). " 'Rules against 'bias' and 'partiality' can never mean to require the total absence of preconception, predispositions and other mental habits....' "

5. Justice Kennedy's concurrence in *Liteky* advocates for a broader rejection of the "extrajudicial source" doctrine, arguing "[t]here is no justification ... for a strict rule dismissing allegations of intrajudicial partiality, or the appearance thereof, in every case." 510 U.S. at 562–63, 114 S.Ct. at 1161, 127 L.Ed.2d at 495 (Kennedy, J., concurring). He explains the relevant federal statute, like Iowa's, "does not refer to the source of the disqualifying partiality. And placing too much emphasis upon whether the source is extrajudicial or intrajudicial distracts from the central inquiry ... the appearance of partiality." *Id.* at 558, 114 S.Ct. at 1158–59, 127 L.Ed.2d at 492–93. Kennedy suggests the

[s]tandard that ought to be adopted for all allegations of an apparent fixed predisposition, extrajudicial or otherwise, follows from the statute itself: Disqualification is required if an objective observer would entertain reasonable questions about the judge's impartiality. If a judge's attitude or state of mind leads a detached observer to conclude that a fair and impartial hearing is unlikely, the judge must be disqualified. *Id.* at 564, 114 S.Ct. at 1162, 127 L.Ed.2d at 496–97.

6. We note the Iowa Code of Judicial Conduct defines "impartiality"—a central requirement of the judicial office—in part as "maintenance of an open mind in considering issues that may come before a judge." Iowa Ct. R. ch. 51, Terminology; *see also* Iowa Code of Judicial Conduct 51:2.2 cmt. 1 ("To ensure impartiality and fairness to all parties, a judge must be objective and open-minded.").

*United States v. Thirion,* 813 F.2d 146, 155 (8th Cir.1987) (citation omitted).

Moreover, after a recess to consider the motion to recuse, the judge indicated he would be able to decide the case fairly and impartially, stating: "I will hear all of the remaining testimony, keeping an open mind as to the weight and effect it should be given." *See State v. Smith,* 242 N.W.2d 320, 324 (Iowa 1976) (" 'The judge is entitled to consult his own mind, and he, perhaps better than anyone else, knows whether or not he can give a defendant on trial before him a fair and impartial trial in every way.' " (citation omitted)). In light of the foregoing, we affirm the juvenile court's denial of C.C.'s motion to recuse.

### B. Discovery Rulings.

C.C. next claims the juvenile court violated his right to effective assistance of counsel under the federal and state constitutions by denying his requests for a private investigator and depositions at the State's expense.[7]

### ▮ 1. Private Investigator.

Due process requires counsel appointed under a statutory directive, such as here, to provide effective assistance. *In re D.P.,* 465 N.W.2d 313, 316 (Iowa Ct.App. 1990). "The right to effective assistance of counsel requires more than a mere formal appointment. It requires appointment of effective counsel and counsel that are afforded 'an opportunity' and 'time' to prepare and present their indigent client's case." *State v. Williams,* 207 N.W.2d 98, 104 (Iowa 1973). Thus, an indigent's "right to effective counsel includes the right to public payment for reasonably necessary investigative services." *English v. Missildine,* 311 N.W.2d 292, 293–94 (Iowa 1981).

While every criminal defendant who is financially unable to obtain counsel is entitled to appointment of counsel at state expense, not every similarly situated defendant is entitled to appointment of an investigator or to other expert services. Before authorizing such services to be furnished at state expense there must be a finding that they are necessary in the interest of justice.

*Williams,* 207 N.W.2d at 105; *see also* Iowa Code § 815.7(1), (5) (stating the expenses due to an attorney "appointed by the court to represent any person pursuant to section 814.11 or 815.10 ... shall include any sums as are necessary for investigations in the interest of justice"). When counsel requests court authority for the employment of an investigator, he or she "should point out with specificity the reasons such services are necessary." *Williams,* 207 N.W.2d at 105. That was not done in this case.

▮ C.C.'s application, which requested up to $750 for an investigator, did not specify "the area to be investigated, the individuals to be employed for such investigation, their number, [or] the cost or rate of pay of said investigators." *Id.* at 103. The application did state "[c]ommunication with certain third parties has the potential to either put the undersigned in the position of becoming a witness in this case ... or would result in the undersigned violating the Rules of Professional Responsibility," but did not identify who those third parties were.

The court in *Williams* found a similarly deficient application to be lacking in the requisite specificity, thereby preventing the district court from ascertaining whether the defendant's claim was "necessary in the interest of justice." *Id.* at 106. We reach the same conclusion here. *See State*

---

7. We find the State's error preservation and waiver arguments to be without merit.

*v. Woodyard,* 414 N.W.2d 654, 659 (Iowa Ct.App.1987) (stating an attorney "must specifically articulate the reason or reasons which serve to make such services necessary so the trial judge may independently determine the matter of need or necessity"). Furthermore, C.C. has not made any showing that an allowance of funds for a private investigator "could have made any difference in the facts of this case," though we recognize that is a difficult showing to make. *State v. Aguilar,* 325 N.W.2d 100, 102 (Iowa 1982). We accordingly affirm the juvenile court's denial of C.C.'s request for funds for a private investigator.

■ *2. Depositions.* At the pretrial conference on September 24, 2009, the State listed twenty-one witnesses it intended to call at the trial scheduled for October 12. Two days later, C.C. filed a motion requesting to take all of those witnesses' depositions at the State's expense. The motion asserted the depositions were "necessary in order to assure the Defendant receives adequate representation at trial." The juvenile court summarily denied the motion. C.C. immediately filed an amended motion, this time requesting to take depositions of only six of the State's listed witnesses. The motion stated:

> The undersigned has already contacted and spoken with as many of the State's listed witnesses as she was granted permission to speak to. However, not all of the State's listed witnesses are willing to speak to the undersigned informally.
>
> ... The witnesses who have refused to speak to the undersigned are the very same witnesses who know the most about the events of the night in question.
>
> ... Because the undersigned is unable to satisfactorily complete informal discovery, and in order to assure the

Defendant receives adequate representation at trial, the undersigned would like the opportunity to proceed to formal discovery in the form of depositions, at which time she would be able to subpoena the witnesses who will not speak to her informally.

A hearing on the amended motion was held on October 1. In a brief submitted to the court prior to the hearing, C.C. argued:

> A number of the State's listed witnesses in this case are juveniles represented by counsel. As a result, in order to speak informally with these witnesses while still adhering to the Rules of Professional Responsibility, the undersigned must get past two gatekeepers: the juvenile witness's attorney and the juvenile witness's parents. The witnesses who have not responded to the undersigned's attempts to contact them, and the witnesses whose attorneys or parents have denied the undersigned['s] requests to speak [to] the witnesses informally, are for the most part [C.C.'s] co-defendants—the very same witnesses whose statements led the State to filed weapons charges against [C.C.]. Because the State has no physical evidence connecting [C.C.] to a weapon, the State must meet its burden of proof based *solely* on the witnesses' accounts of the incidents in question. Thus, in order to effectively represent [C.C.], the undersigned must have the opportunity to evaluate and challenge those statements, to form a theory of her case and to strategize about how to effectively undermine those statements at trial.

C.C.'s attorney repeated those arguments at the hearing, additionally asserting that although some of the witnesses' statements had been made available to her,

> when I don't know the context in which it was written, when I don't have a

chance to clarify or question anything in the ... statement itself, I really just don't think that's a substitute for being able to have a conversation with these people and question the timeline ... just basically how the events occurred in general....

The State responded that it was

interested in assisting Ms. Antonuccio with talking to [P.J.] ... [R.G.] ... and [A.J.] ... which I believe are the three that head her list....

I think with speedy trial demands we're going to be pushed.... And so we're both compromised there. We are also compromised by the fact that we have reluctant witnesses on both sides. Goons don't want to come in and testify. Hard Bodies do not want to come in and testify.

I did ask [P.J.'s] ... attorney ... and [R.G.'s] ... attorney ... to make them available.... We've gotten no response.... [T]he parents are not interested in allowing their son to testify other than what he's absolutely required to do by subpoena....

. . . .

... [W]e would be simply hopeful that parents would cooperate ... without a subpoena. But the time is very short. So I'm thinking that ... these folks will come to trial and they'll get up and they'll testify, and the case is what it is. In other words, we'll do our best to work together to talk to everybody together and/or separately.

Despite the State's willingness to cooperate with depositions before the hearing, the court ruled as follows:

[I]t sounds like to me, that all that information has been exchanged, that there is clearly adequate notice as to what these witnesses intend to testify to at trial; and I don't see that further formal

depositions would be any more enlightening, certainly not under the Rules for juvenile procedure and given the demand for speedy adjudication in this case.

So the Court is not convinced that there are any particularly compelling reasons that depositions should be ordered in this case.

We disagree.

Iowa Court Rule 8.1 prescribes the scope of discovery in juvenile proceedings as follows:

In order to provide adequate information for informed decision making and to expedite trials, minimize surprise, afford opportunity for effective cross-examination and meet the requirements of due process, discovery prior to trial and other judicial hearings should be as *full and free as possible* consistent with protection of persons and effectuation of the goals of the juvenile justice system.

(Emphasis added.) Rule 8.2(2) specifies that in delinquency proceedings, "[a]lthough informal discovery methods are preferred, upon good cause shown, depositions and interrogatories by any party may be permitted by the court ... except where they conflict with these rules or with statutes." We believe given the unique circumstances of this case, as detailed below, C.C. established good cause existed for depositions at State expense.

First, the large amount of potential witnesses listed by the State at the pretrial conference severely hampered defense counsel's ability to engage in the informal discovery methods preferred by our rules of juvenile procedure and case law. *See* Iowa Ct. R. 8.2(2); *In re A.S.,* 743 N.W.2d 865, 868 (Iowa Ct.App.2007) ("[O]ur case law has long held that juvenile proceedings should be conducted in an informal manner."). Second, many of these witnesses, some of whom were C.C.'s codefendants,

did not want to talk to anyone unless forced to do so. C.C.'s attorney consequently had an admittedly difficult time preparing for trial. *See Williams,* 207 N.W.2d at 104 (stating appointed counsel must be afforded the opportunity and time to prepare and present their indigent client's case).

Third, C.C. amended his initial blanket request for depositions of all the State's witnesses to a select few—those who had the most information about the shooting. Fourth, although the trial date was quickly approaching, the State agreed to facilitate C.C.'s request for depositions, in part because the State also needed to examine the reluctant witnesses before trial. Fifth, allowing the depositions requested by C.C. would not conflict with any juvenile court rules or statutes. It would have instead advanced the goal of "full and free" discovery in rule 8.1 in order to "minimize surprise, afford opportunity for effective crossexamination and meet the requirements of due process." *See State v. Eads,* 166 N.W.2d 766, 769 (Iowa 1969) (observing "that surprise and guile should, as far as possible, be removed from the arena in criminal trials just as it has in civil cases").

For all these reasons, we find the juvenile court abused its discretion in denying C.C.'s request for depositions at the State's expense. C.C.'s substantial rights were prejudiced by this denial, as his inability to depose any witnesses to the shooting prior to the trial undermined his general denial defense. *See State v. Tune,* 13 N.J. 203, 98 A.2d 881, 897 (1953) (Brennan, J., dissenting) ("To shackle counsel so that they cannot effectively seek out the truth and afford the accused the representation which is not his privilege but his absolute right seriously imperils our bedrock presumption of innocence.").

The State's case against C.C. was based solely on the testimony of witnesses to the shooting, as the gun used was never recovered. Unlike a criminal trial, the State was not required to file minutes of testimony setting forth "a full and fair statement of the witness' ... expected testimony at trial." Iowa R.Crim. P. 2.4(6)(*a*); *cf. State v. Grimme,* 338 N.W.2d 142, 146 (Iowa 1983) (finding no prejudice to defendant in court's denial of motion to take depositions where the "minutes of testimony disclosed much of what defendant might have learned from depositions"). Several of the witnesses were C.C.'s codefendants and interested in distancing themselves from the shooting. Their credibility was suspect, and C.C. should have been given a chance to test the veracity of their statements prior to trial. *See State v. Johnson,* 259 Iowa 599, 604, 145 N.W.2d 8, 11 (1966) (Rawlings, J., concurring specially) ("[C]ourts should ... strive for practices which will more effectively promote the quest for truth. Nonrevealment by the state should be the exception, not the rule."); *see also State v. Gates,* 306 N.W.2d 720, 726 (Iowa 1981) (cautioning that "in exercising their supervisory authority, trial courts must strike a careful balance between the interest in economizing discovery and the rights afforded criminal defendants").

### IV. Conclusion.

We conclude the juvenile court did not abuse its discretion in rejecting C.C.'s request for a private investigator or in denying his motion to recuse. The court did, however, abuse its discretion in denying C.C.'s request for depositions at the State's expense, thereby prejudicing C.C. We accordingly reverse the court's finding that C.C. committed delinquent acts, and because we reject C.C.'s challenge to the sufficiency of the evidence, we remand for a new adjudicatory hearing.

**REVERSED AND REMANDED.**

VOGEL, P.J., concurs; TABOR, J. concurs in part, concurs specially in part, and dissents in part.

TABOR, J. (concurring in part, concurring specially in part, and dissenting in part).

While I agree with the outcome of the well-crafted majority opinion, I write separately to express my view that the juvenile court abused its discretion in denying the child's motion for disqualification. Before the State completed its case-in-chief, the judge suggested to the child's attorney that she and her client "reconsider the situation that the Court believed they were creating" and that she "speak with her client about simply telling the truth and discontinuing the process of inflicting this terrible emotional distress on his friends." I believe that these statements by the court reveal the kind of "personal bias or prejudice concerning a party" that calls for the judge's disqualification under Iowa Code section 602.1606(1). In addition, when considering the comments to Iowa Code of Judicial Conduct Rule 51:2.11, a reasonable person would question the judge's impartiality upon hearing this pronouncement—midway through trial—that he believed the accused should "tell the truth" and forego his due process right to confront his accusers. *See In re Johnson,* 257 N.W.2d 47, 49 (Iowa 1977) (recognizing juvenile's right in delinquency proceeding to confront and crossexamine adverse witnesses).

It is a venerable precept in our law that "[t]he presumption of the innocence of an accused attends him throughout the trial." *See Kirby v. United States,* 174 U.S. 47, 55, 19 S.Ct. 574, 577, 43 L.Ed. 890, 894 (1899). Here, the juvenile court thwarted that presumption of innocence by prematurely endorsing the credibility of the State's witnesses and openly urging the child's attorney to counsel her client to admit his guilt. I believe that the judge's active efforts to influence the child to admit guilt so that the State's witnesses could avoid the angst of testifying against him exposed a pervasive bias on the part of the judge, requiring his recusal.[8]

The following passage from the United States Supreme Court's interpretation of the federal recusal rules is illustrative:

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.

*Liteky v. United States,* 510 U.S. 540, 550–51, 114 S.Ct. 1147, 1155, 127 L.Ed.2d 474, 488 (1994). While a judge's ill disposition toward the accused *upon completion of the evidence* is not grounds for recusal, a judge's expressed opinion regarding the guilt of the accused *before completion of the evidence* does not fall under the same exemption from recusal.

The majority opinion provides a valuable discourse on the extra-judicial source doctrine, intimating that our case law may be off track in requiring that the disqualifying bias or prejudice "stem from an extrajudi-

---

**8.** I respectfully disagree with the majority's belief that the judge's later statement that he would keep an open mind during the remaining testimony ends the recusal analysis. Even after the judge's more politic response to the recusal motion, a reasonable person could question the judge's impartiality based on his earlier effort to lobby the child's attorney for a guilty plea.

cial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *See State v. Smith,* 282 N.W.2d 138, 142 (Iowa 1979). The *Smith* case quotes the extra-judicial-source language from *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778, 793 (1966), which in turn relies on *Berger v. United States,* 255 U.S. 22, 31, 41 S.Ct. 230, 232, 65 L.Ed. 481, 484–85 (1921). Both of those Supreme Court cases were reexamined in Liteky. In his concurrence, Justice Kennedy clarified that neither case should be read as setting out a per se rule that an extrajudicial source is a prerequisite for recusal:

> Although *Grinnell's* articulation of the extrajudicial source rule has a categorical aspect about it, the decision, on closer examination, proves not to erect a *per se* barrier. After reciting what appeared to be an absolute rule, the Court proceeded to make a few additional points: that certain in-court statements by the judge "reflected no more than his view that, if the facts were as the Government alleged, stringent relief was called for"; that during the trial the judge "repeatedly stated that he had not made up his mind on the merits"; and that another of the judge's challenged statements did not "manifes[t] a closed mind on the merits of the case," but rather was "a terse way" of reiterating a prior ruling. *Ibid.* Had we meant the extrajudicial source doctrine to be dispositive under § 144, those further remarks would have been unnecessary.

> More to the point, *Grinnell* provides little justification for its announcement of the extrajudicial source rule, relying only upon a citation to *Berger v. United States,* 255 U.S. 22, 31, 41 S.Ct. 230, 232, 65 L.Ed. 481 (1921). The cited passage from *Berger,* it turns out, does not bear the weight *Grinnell* places on it, but

stands for the more limited proposition that the alleged bias "must be based upon something other than rulings in the case."

*Liteky,* 510 U.S. at 559–60, 114 S.Ct. at 1159, 127 L.Ed.2d at 493–94 (Kennedy, J., concurring).

If our court were free to do so, I would urge that we disavow those Iowa cases that repeat the refrain that "[o]nly personal bias or prejudice stemming from an extrajudicial source constitutes a disqualifying factor." *See, e.g., State v. Millsap,* 704 N.W.2d 426, 432 (Iowa 2005); *State v. Jacobs,* 644 N.W.2d 695, 699 (Iowa 2001); *State v. Haskins,* 573 N.W.2d 39, 45 (Iowa Ct.App.1997). Iowa's appellate courts should follow the federal recusal jurisprudence and abandon our strict application of the extra-judicial source doctrine. As the *Liteky* court observed, "The fact that an opinion held by a judge derives from a source outside judicial proceedings is not a *necessary* condition for 'bias or prejudice' recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice." *Liteky,* 510 U.S. at 554, 114 S.Ct. at 1157, 127 L.Ed.2d at 490. I believe that the conduct at issue in this case qualifies as one of those rare occasions where the judge's predisposition developed during the trial would suffice for recusal.

I would remand this delinquency action for a new adjudicatory hearing before a different juvenile judge. *See* Iowa Code § 232.47(3); Iowa Code of Judicial Conduct 51:1.2.