# IN THE SUPREME COURT OF IOWA

No. 20–1346

Submitted March 23, 2022—Filed June 24, 2022

Amended June 30, 2022

**STATE PUBLIC DEFENDER,**

Petitioner,

vs.

**RODRIGO ADOLPHO AMAYA,**

Respondent.

---

Appeal from the Iowa District Court for Polk County, Sarah Crane, Judge.

The State Public Defender challenges a trial court order finding Iowa Code section 815.1 unconstitutional under the Sixth Amendment to the United States Constitution and granting the defendant's request for ancillary services at state expense. **WRIT SUSTAINED.**

Oxley, J., delivered the opinion of the court, in which Waterman, Mansfield, McDonald, and McDermott, JJ., joined. Christensen, C.J., filed an opinion concurring in part and dissenting in part, in which Appel, J., joined. Appel, J., filed a dissenting opinion.

Jeff Wright, State Public Defender, and William Bushell (argued), Assistant State Public Defender, for the plaintiff.

Benjamin D. Bergmann (argued) and Alexander Smith of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer, L.L.P., Des Moines, for the defendant.

Thomas J. Miller, Attorney General, and David M. Ranscht (argued) and Samuel P. Langholz, Assistant Attorneys General, for amicus curiae State of Iowa.

**OXLEY, Justice.**

An estimated 70%–80% of Iowa criminal defendants are indigent,[1] which means that when they are facing what may be one of the most difficult circumstances of their lives, they get a court-appointed attorney selected by a judge unless their family, friends, or others are able to hire a private attorney of the defendant's choosing. Once hired, that attorney may need to hire investigators and experts to help with the defense, but those cost even more money. In 2019, the Iowa General Assembly enacted Iowa Code section 815.1—changing the process by which an indigent defendant can obtain state funding for investigation costs when represented by privately retained counsel. 2019 Iowa Acts ch. 51, § 1 (codified at Iowa Code § 815.1 (2020)). This appeal requires us to determine whether those changes unconstitutionally pit an indigent defendant's right to an attorney of his choosing against his right to services needed to allow him to put on an adequate defense. We conclude they do not.

## I. Factual Background & Proceedings.

Twenty-two-year-old Rodrigo Amaya faces sexual abuse and sexual exploitation charges after police discovered him and a fifteen-year-old girl in the backseat of his car in a secluded area of a city park and videos of the girl on his phone. The court determined Amaya was indigent and appointed the public defender's office to represent him. Amaya's mother was able to pull together $15,000 and retained Benjamin Bergmann, a private attorney who had

---

[1]*See* Anjela Shutts, *President's Letter*, Iowa Law., Feb. 2022, at 5, 5.

experience in sexual abuse cases and was conversant in Spanish to better communicate with Amaya and his family.

Bergmann wanted to hire an investigator and experts to help with Amaya's defense, so Amaya filed a motion with the district court requesting funds from the state to pay for these needed services. Defendants represented by court-appointed counsel receive reasonably necessary ancillary services such as investigation services, the cost of transcripts for depositions, and experts as part of the court appointment. *See* Iowa Code §§ 815.7 (court-appointed attorneys are entitled to reasonable fees and expenses), .10A (providing process for court-appointed attorneys to seek reimbursement of expenses) (2019). Before Iowa Code section 815.1 was enacted, indigent defendants with privately retained counsel could seek state funding for those same ancillary services as long as the defendant showed he was indigent and the court determined the requested services were reasonably necessary.

Effective July 1, 2019, the Iowa General Assembly passed Iowa Code section 815.1, which provides a process for determining whether an indigent defendant who is represented by a privately retained attorney is entitled to have ancillary services paid by the state. 2019 Iowa Acts ch. 51, § 1 (codified at Iowa Code § 815.1 (2020)). The district court may grant an application for state funds for ancillary services if it finds: (1) the defendant is indigent and unable to pay the costs, (2) the costs are reasonable and necessary for the defendant's representation, and (3) the funds available to the retained counsel are insufficient to cover the requested costs. Iowa Code § 815.1(4)(*a*)–(*c*). Amaya

challenges the process used to determine that last step—whether the funds paid to the retained attorney are insufficient to cover the requested costs.

To support the third step of the application process, the retained attorney must provide the court with information about the financial arrangement of his representation, including a copy of the fee agreement, the agreed-upon hourly rate, the amount of the retainer or other money received, the number of hours worked in the case to date, and the expected or anticipated hours needed to finish the case. *Id.* § 815.1(2)(*a*), (*c*)–(*e*). The court then uses a formula that multiplies the anticipated total hours by an hourly rate. *Id.* § 815.1(4)(*c*)(1). Instead of using the retained attorney's agreed-upon rate, the formula uses the statutory contract rate for court-appointed attorneys under Iowa Code section 815.7. *Id.* § 815.1(4)(*c*)(1). If that "calculated product" is greater than the amount available to the retained attorney, the district court can authorize the requested services at state expense. *Id.* § 815.1(4)(*c*)(2). If it is not, the application must be denied. *Id.* § 815.1(4). In essence, the statute precludes state payment for ancillary services for an indigent defendant represented by retained counsel unless the defendant can show that payments to the retained attorney would not cover the retained attorney's time when calculated at the state contract-attorney rate, regardless of the arrangement between the third party and the retained counsel.

As a practical matter, this process would not be a big deal if the statutory contract rate was in the ballpark of the retained attorney's rate. In other contexts, attorneys are used to having their rates compared to a lodestar rate.

*See, e.g.*, *Lee v. State*, 906 N.W.2d 186, 197 n.8 (Iowa 2018) (reviewing a statutory award of fees under the Family and Medical Leave Act and explaining: "The starting point in determining attorney fees is generally the lodestar. Courts calculate the lodestar by multiplying the number of hours reasonably expended by a reasonable hourly rate." (citations omitted)). At the time Bergmann was hired, the contract rate was $63 per hour for representing a defendant charged with Amaya's crimes (the current rate is $68), a rate declared to be "reasonable compensation" by the general assembly. *See* Iowa Code § 815.7(5)–(6). Bergmann's agreement with Amaya's mother charges him out at $300 per hour, a rate no one suggests is out of line for privately retained criminal defense attorneys in Des Moines.

Amaya takes issue with the legislature's characterization of its statutory contract rates as "reasonable compensation." In support of his argument, he offers a recent letter authored by The Iowa State Bar Association president discussing that it takes the average Iowa lawyer $75 per hour to breakeven, the state rates are nearly 60% below the federal appointed-attorney contract rate of $155, and in the last ten years the number of Iowa attorneys willing to contract with the public defender's office has been cut in half, from 1,200 attorneys to now only 650. *See* Anjela Shutts, *President's Letter,* Iowa Law., Feb. 2022, at 5, 5. But no evidence was presented to the district court (including the letter from the February 2022 issue of The Iowa Lawyer magazine) to support a finding that $63 per hour is an unreasonable rate. Nor was the district court asked to find that rate unreasonable.

Amaya's motion for services generally sought funds to cover the costs of an investigator and depositions but did not request specific amounts.[2] Instead, his motion challenged the constitutionality of section 815.1 under both the Federal and Iowa Constitutions. He specifically argued that to the extent section 815.1 incorporates the contract rate from section 815.7, it requires private attorneys to either lower their hourly rate to the $63 contract rate or forego taking depositions, serving subpoenas, undertaking investigations, and hiring expert witnesses. Amaya argues that this places indigent defendants who are able to retain a private attorney through a third-party source in a Hobson's choice: he can either keep his counsel of choice but without the needed ancillary services or he can forego his counsel of choice and accept a court-appointed attorney to receive the needed services at state expense. Requiring him to give up one or the other, argued Amaya, violated his constitutional rights.

After objection by the State Public Defender (SPD), who is part of the application process, *see* Iowa Code § 815.1(3) (requiring a copy of the application and attached documents to be submitted to the public defender), Bergmann provided a copy of his fee agreement with Amaya's mother, which required a $15,000 retainer and specified an hourly rate of $300. Bergmann informed the court he had performed 16.1 hours and estimated that Amaya's case would

---

[2]At the district court hearing on Amaya's application for state funding for the ancillary services, Amaya's counsel mentioned two doctors, one who would charge $1,500 and another who would charge $2,000, though it is unclear if he planned to hire one or both of them. Amaya's counsel did not request a specific amount to cover depositions or any other type of investigators. During the oral argument on appeal, Amaya's counsel agreed that $5,000 would be on the high side needed to cover typical ancillary services in a case like Amaya's.

require an additional 70 hours of his time through trial. At his hourly rate of $300, counsel expected his representation to cost $25,830, thereby exceeding the $15,000 retainer and leaving nothing left to cover the litigation costs.[3] However, using the statutory contract rate of $63 per hour, Bergmann's 86.1 projected hours[4] totaled $5,424, leaving $9,576 from the retainer to cover the requested ancillary services and making Amaya ineligible for state funding for these costs.

The district court concluded that using the contract rate to determine whether funds paid to a privately retained attorney were insufficient to cover reasonable and necessary litigation costs to trigger state funding violated Amaya's rights under the Sixth Amendment to the United States Constitution. The court reasoned:

> Although, the Iowa legislature may determine appropriate procedures to implement a constitutional right, those procedures cannot serve to deny access to the constitutional right.
>
> Through section 815.1, the Defendant's right to auxiliary services at State expense is conditioned on whether the private attorney will accept payment at a rate far below the customary private market. If the defense attorney will not accept lower rates

---

[3]At oral argument to our court, Bergmann made the professional statement that in these kinds of cases he generally does not receive compensation beyond the initial retainer, a situation he expected to hold true in Amaya's case.

[4]Bergmann also reported to the district court that one associate attorney had already billed 53 hours at $250 per hour and another had billed 5.8 hours at $200. Combined with the 16.1 hours of time by lead counsel, the firm had already billed $19,240 and consumed the $15,000 retainer. Counsel stated there was an outstanding balance owed for the difference. The SPD objected to considering billings for more than the lead attorney, *see* Iowa Code § 815.1(2)(*a*) (referring to the number of hours worked by "the attorney," singular), and the district court and parties considered only lead counsel's projected total of 86.1 hours for purposes of the statutory calculations. Amaya does not challenge on appeal the district court's decision to disregard the associates' hours in determining whether funds are available from the retainer to cover ancillary services, so we do not address whether those additional hours should have been included in the section 815.1(4)(*c*) calculation.

and the Defendant (or family member) cannot afford to pay the private attorney their rate and also pay for auxiliary services, the defendant has two choices: 1) abandon the privately retained counsel and accept court-appointed counsel, at which point the defendant could obtain auxiliary services at state expense or 2) forego the additional auxiliary services.

Additionally, the district court reasoned that using the court-appointed hourly rate from Iowa Code section 815.7 in the statutory calculation forced counsel to work at that lower rate, instead of the agreed-upon rate. The district court severed that portion of the statute, used Amaya's counsel's agreed rate of $300, and concluded that funds available to counsel were in fact insufficient to cover the requested litigations costs. The district court granted in full Amaya's request for investigative services and depositions at state expense.

The SPD filed a notice of appeal from the district court's order, and we retained the case.

## II. Form of Review.

The parties and the State (as amicus) dispute the proper form of our review. The SPD argues the district court's order was a final judgment subject to direct appeal, relying on Iowa Code § 13B.4(4)(*d*)(7). The State argues the district court's review of an application under section 815.1 is a preclaim determination not subject to the claim process in section 13B.4, such that the SPD's appeal should have been brought pursuant to a writ of certiorari. *See Crowell v. State Pub. Def.,* 845 N.W.2d 676, 682 (Iowa 2014). Amaya takes no position on the proper form of review but agrees we can, and should, decide the issues raised.

Although the parties are correct that we can consider the appeal even if the SPD was not entitled to appeal as a matter of right, *see* Iowa R. App. P. 6.108

(providing that a case initiated under the wrong form of review "shall proceed as though the proper form of review had been requested"), we nonetheless answer the question as it will be a recurring issue.

Parties may appeal as a matter of right only from a final judgment. *Id.* r. 6.102(2). In 2006, the general assembly amended Iowa Code section 13B.4(4)(*d*)(7), declaring: "The decision of the court following a hearing on the motion is a final judgment appealable by the state public defender or the claimant." 2006 Iowa Acts ch. 1041, § 3 (codified at Iowa Code § 13B.4(4)(*d*) (2006)). But what motion? Section 13B.4(4) provides a process for the SPD to review specific claims for payment of indigent defense costs, providing the parameters under which the SPD may approve, deny, or reduce the claims. Iowa Code § 13B.4(4)(*c*). Paragraph (*d*) allows a claimant to file a motion with the district court for review of any claim the SPD denies or reduces. *Id.* § 13B.4(4)(*d*). The district court's ruling on this motion is the order the general assembly declared to be a final order immediately appealable as a matter of right in section 13B.4(4)(*d*)(7).

The decision at issue here is from a motion directly to the district court under section 815.1 seeking preapproval for state funding of litigation expenses. *See id.* § 815.1(1)–(2). It is not the type of decision covered by section 13B.4(4)(*d*)(7). Indeed, section 815.1 contemplates that once an order for expenses is granted, the defendant will then use the process identified in section 13B.4(4) to seek payment or reimbursement by submitting a claim pursuant to section 13B.4(4)(*c*). *See id.* § 815.1(7) (directing the retained attorney or claimant

for state-funded expenses to "submit a claim for payment in accordance with the rules of the state public defender"). The plain language of section 13B.4(4)(*d*)(7) does not extend to the order at issue in this appeal and is therefore not a final order.

The SPD is not a party to the underlying case, although by statute it had a right to, and did, participate in the underlying hearing. A writ of certiorari is "available to all persons who may show a substantial interest in the matter challenged." *Crowell*, 845 N.W.2d at 683 (emphasis omitted) (quoting *Hohl v. Bd. of Educ.*, 94 N.W.2d 787, 791 (Iowa 1959)); *see also State Pub. Def. v. Iowa Dist. Ct.*, 594 N.W.2d 34, 36 (Iowa 1999) ("It has long been established that the proper mode of review of a trial court's allowance of fees . . . is by petition to this court for an original writ of certiorari."). Since we have concluded the district court's order is not a final judgment under section 13B.4, SPD was required to bring an original action by way of a petition for writ of certiorari. *See* Iowa R. App. P. 6.107. We treat the notice of appeal as a petition for writ of certiorari, grant the petition, and proceed to the merits. *See id.* r. 6.108.

**III. Preliminary Matters.**

We first address some preliminary matters before getting into the constitutional issues.

**A. Did Section 815.1 Force Amaya's Retained Attorney to Work for the Court-Appointed Contract Rate?** Amaya brought an as-applied challenge to the constitutionality of section 815.1, so it is important to understand how the statutory framework applies specifically to his case. We start with some math

to put the parties' positions into proper context. Amaya argues section 815.1's use of section 815.7's rates forces his retained counsel to work at the $63 court-appointed contract rate even though Amaya's mother agreed to pay Bergmann $300 per hour, a conclusion the district court also made. But taking Bergmann at his word that he does not expect to receive more than the $15,000 retainer, Bergmann is already being paid less than $300 per hour. Bergmann expected to work a total of 86.1 hours on Amaya's case. Ignoring the two associates working on the file, Bergmann's effective rate is more like $174 per hour ($15,000 divided by 86.1 hours). The point is that even though Bergmann charges $300 per hour, in cases where he accepts a retainer from an indigent defendant's family even he does not expect to actually receive that rate.

Another math problem is needed to determine Bergmann's effective rate if part of the $15,000 retainer is used to cover the requested ancillary services. Amaya did not ask for a specific amount to cover the investigation and deposition costs, choosing instead to focus on his constitutional challenge to the statute. Without a specific requested amount, this math may be a little fuzzy. But at oral argument, Bergmann agreed that $5,000 would be on the high side of the amount he would expect to spend for ancillary services in a case like Amaya's. Using the retainer to pay the estimated $5,000 would leave $10,000 to cover Bergmann's fees. And using the parties' agreed amount of 86.1 hours as the total estimated hours for purposes of the statutory formula, Bergmann would still receive an effective rate of $116 per hour. The point here is that even estimating

high, denying state funding for Amaya's ancillary services would not force Bergmann to work for the court-appointed contract rate of $63 per hour.

So, for purposes of discussion, the more accurate comparison is Bergmann's effective rate of $174 per hour if he is not required to cover ancillary services out of the retainer and $116 per hour if he is.

**B. What Funds Have Been or Are to Be Paid to Amaya's Retained Counsel?** Amaya challenges the process used to determine the third requirement of section 815.1, which allows the state to pay for ancillary services only if the funds available to the retained counsel are insufficient to cover the requested costs. Iowa Code § 815.1(4)(*c*). He does not argue with the underlying premise that if funds available to the retained attorney are sufficient to cover the ancillary services then state funds should not be used. Rather, he challenges the process that uses the court-appointed contract rate in making that determination.

In the fee agreement, Amaya's mother expressly agreed to pay—either directly or through reimbursement to Bergmann—the same ancillary services Amaya seeks to have paid by the state, including deposition expenses, expert witness fees, and investigators. The fee agreement identified the $15,000 payment as an "initial retainer and expense deposit" and explained that the total fees and costs may exceed the amount of the deposit, for which Amaya's mother agreed to pay.

Where a third party agrees to pay the ancillary services associated with representing an indigent defendant, the defendant can hardly claim that the

state's refusal to cover those same costs violates his constitutional rights. A third-party agreement to pay those costs is no different than a third-party agreement to pay the defendant's attorney's fees, which the state is not constitutionally obligated to pay. *See In re Cannady*, 600 A.2d 459, 463 (N.J. 1991) ("We recognize that the friends and families of indigent defendants have the right to engage private counsel. Of course, the State is not required to pay for counsel of the defendant's choice at public expense."). So if the third party agrees to cover ancillary services as well as the attorney's fees, there is no constitutional basis for requiring the state to cover them.

Bergmann's fee agreement obligates Amaya's mother to cover the litigation expenses. Section 815.1 speaks in terms of "moneys paid *or to be paid* to the privately retained attorney." Iowa Code § 815.1(4)(*c*) (emphasis added). As a matter of basic contract principles, money owed under a contract would generally be considered "moneys . . . to be paid." *Id.* A straight reading of the statute could end this case here—Amaya's mother agreed to cover the costs of the services sought in Amaya's motion for state funding so "moneys . . . to be paid" to Bergmann under the fee agreement are sufficient to pay the requested services, *id.*, and the statutory requirements are not met even without considering the challenged formula.

But that leaves some unanswered and concerning questions about what a retained attorney requesting state funding must show. By its plain terms, the statute requires the district court to consider all monies to be received, even if not yet in hand. But what of monies contractually obligated but not really

expected? What collection efforts must an attorney undertake to show that contractually owing payments are not forthcoming, and therefore not "to be paid" as contemplated by section 815.1(4)(*c*)? There are certainly ways a retained attorney could game the system, but we do not see that as an issue here. In any event, the district court was not presented with this issue and did not decide it. We leave for another day the interpretation of this portion of section 815.1(4)(*c*) and turn to the constitutional issues raised by this appeal.

**IV. Analysis.**

"We review constitutional challenges to a statute de novo." *State v. Thompson*, 836 N.W.2d 470, 483 (Iowa 2013) (quoting *State v. Seering*, 701 N.W.2d 655, 661 (Iowa 2005), *superseded by statute on other grounds*, 2009 Iowa Acts ch. 119, § 3 (codified at Iowa Code § 692A.103 (Supp. 2009)), *as recognized in Planned Parenthood of the Heartland, Inc., v. Reynolds*, 962 N.W.2d 37, 46 (Iowa 2021)). Statutes "are cloaked with a strong presumption of constitutionality" and any challenger must prove unconstitutionality "beyond a reasonable doubt." *State v. Biddle*, 652 N.W.2d 191, 200 (Iowa 2002).

**A. What Constitutional Protections Support an Indigent Defendant's Right to Ancillary Services?** This case involves two distinct interests: the right to counsel of choice and the right to ancillary litigation services (e.g., investigators, experts, and depositions) reasonably necessary to put on a defense. A defendant's constitutional right to counsel under both the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution includes the right to counsel of choice, i.e., "the counsel [the

defendant] believes to be best," as long as the defendant does not require counsel appointed at state expense. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144–46 (2006); *see also State v. Smith*, 761 N.W.2d 63, 69–70 (Iowa 2009) (construing article I, section 10 consistent with the similarly worded Sixth Amendment, which "guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds" (quoting *Gonzalez-Lopez*, 548 U.S. at 144)). But that right is not absolute. *See, e.g., State v. Miller*, 542 N.W.2d 241, 245 (Iowa 1995) (explaining defendant did not have the right to be represented by unlicensed counsel). The right is more accurately described as "grant[ing] a defendant 'a fair opportunity to secure counsel of his own choice.' " *Luis v. United States*, 578 U.S. 5, 11 (2016) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)).

> A defendant has no right, for example, to an attorney who is not a member of the bar, or who has a conflict of interest due to a relationship with an opposing party. And an indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice.

*Id.* at 11–12 (citations omitted). But as a general matter, as long as Amaya is able to secure counsel without state funding, he has a constitutionally protected right to his counsel of choice, which in this case is Bergmann. *Id.* at 12 (recognizing the right, though limited, is still a fundamental right).

Separately, we have held that an indigent defendant has a right to reasonably necessary ancillary services paid at state expense, even if the defendant is represented by counsel retained by a third party. *See English v.*

*Missildine*, 311 N.W.2d 292, 293–94 (Iowa 1981) (holding the Sixth Amendment right to effective assistance of counsel included the right to a handwriting expert at state expense for an indigent defendant with privately retained counsel). *English v. Missildine* is at the heart of the parties' dispute and was the basis for the district court's ruling that part of section 815.1 is unconstitutional.

Mark English, an indigent 18-year-old, was charged with theft, and his mother paid $900 to retain private counsel for him. *Id.* at 293. However, English's mother could not afford to pay for the services of a handwriting expert or the costs of a court reporter to obtain a transcript of needed depositions, so English applied for those services at state expense. *Id.* The parties agreed the pretrial services were reasonably necessary for defending the case and that there were no funds available to pay for those services. *Id.* We prefaced the analysis in *Missildine* by explaining, "[T]his is not a case where an accused has rendered himself impecunious by an unreasonable expenditure of funds to retain private counsel. *Nor is it a case where counsel's fee should reasonably be expected to cover investigative services.*" *Id.* at 294 (emphasis added). More on that last sentence later.

English relied solely on the Sixth Amendment to support his claimed constitutional entitlement to a state-funded handwriting expert, and we limited our analysis accordingly. *Id.* at 293. We recognized that "the right to effective counsel [for indigent defendants] includes the right to public payment for reasonably necessary investigative services." *Id.* at 293–94 (citing *State v. Williams*, 207 N.W.2d 98, 104–05 (Iowa 1973); *State v. Hancock*, 164 N.W.2d

330, 333 (Iowa 1969)). Iowa Code section 815.7, which provided ancillary services to indigent defendants represented by court-appointed counsel, only "partially implement[ed] this constitutional right" because "the Constitution independently mandates judicial recognition of an indigent's right to necessary investigative services." *Missildine*, 311 N.W.2d at 294 (citing *Williams*, 207 N.W.2d at 104). We rejected the state's argument that the defendant's remedy was to accept court-appointed counsel, which would entitle him to the requested services under section 815.7. *Id.* This remedy merely "beg[ged] the question." *Id.*

> If . . . the sixth amendment provides authority for furnishing investigative services to indigents at public expense without regard to whether the indigent is represented by counsel at public expense, the fact that indigents represented by counsel at public expense have the same right is not material. It would be strange if the Constitution required the government to furnish both counsel and investigative services in cases where the indigent needs and requests public payment for only investigative services. The State's theory would impose an unreasonable and unnecessary additional burden on the public treasury.

*Id.*

The parties question whether *Missildine* remains good law in light of a subsequent United States Supreme Court case, *Ake v. Oklahoma*, 470 U.S. 68 (1985). There, the Supreme Court identified the Fourteenth Amendment's Due Process Clause as the source protecting a criminal defendant's right to state funding for a psychiatrist deemed necessary to support his insanity defense. *See id.* at 76, 86–87. The Supreme Court

> has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of

> fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake.

*Id.* at 76. Although a state is not required to "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy," the Court held that "fundamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system.' " *Id.* at 77 (quoting *Ross v. Moffitt*, 417 U.S. 600, 612 (1974)). Where the defendant's sanity was "a significant factor at trial," the Supreme Court made clear that its "concern is that the indigent defendant *have access* to a competent psychiatrist" to help evaluate, prepare, and present the defense. *Id.* at 83 (emphasis added). "[A]s in the case of the provision of counsel," the Supreme Court left "to the State the decision on how to implement this right." *Id.* Having relied on the Due Process Clause, the Supreme Court "ha[d] no occasion to consider the applicability of the Equal Protection Clause, or the Sixth Amendment, in this context." *Id.* at 87 n.13.

Although our analysis in *Missildine* was necessarily limited to the Sixth Amendment based on the way the case reached us, our reliance on *State v. Williams* and *State v. Hancock* reveals that we recognized a broader constitutional base for state-funded ancillary services for indigent defendants. *See Missildine,* 311 N.W.2d at 293–94 (citing *Williams,* 207 N.W.2d at 104–05; *Hancock,* 164 N.W.2d at 333). In *Williams,* we explained that an indigent defendant represented by appointed counsel was entitled to the costs to reasonably investigate the charges against him at state expense both as a matter of providing effective assistance of counsel under the Sixth Amendment and

article I, section 10 of the Iowa Constitution, and as a matter of providing a fair trial as required by the due process provisions of the Fourteenth Amendment and article I, section 9 of the Iowa Constitution. *See* 207 N.W.2d at 104. In *Hancock,* we recognized that "the denial of defendant's request for a handwriting analysis has overtones sounding in due process and equal protection of the laws." 164 N.W.2d at 333. Our reliance on *Williams* and *Hancock* reveals that an indigent defendant's right to state-funded ancillary litigation services is grounded as well in fundamental fairness protected by due process. *Ake* does not undermine our holding in *Missildine,* and we see no reason to retreat from it here.

**B. Does the Section 815.1 Framework Unconstitutionally Pit an Indigent Defendant's Right to Counsel of Choice Against His Right to State-Funded Ancillary Services?** *Ake* makes clear that the right to state-funded ancillary services is not unconditional. *Ake* was concerned with ensuring indigent defendants have an "adequate opportunity" to present their defense, *Ake,* 470 U.S. at 77 (quoting *Moffitt,* 417 U.S. at 612), and that they have "access to competent" ancillary services when reasonably necessary to that defense, *id.* at 83. *Ake* further left application of the right to ancillary services to states to administer, *id.*, much the way states ensure a criminal defendant's right to representation. So what does a state need to do to ensure an "adequate opportunity" to present a defense and "access" to reasonably necessary ancillary services?

The same way that an indigent defendant whose family or friends pay for a private attorney cannot require the state to pay that attorney, *see Cannady*, 600 A.2d at 463, he likewise cannot require the state to pay for ancillary services necessary to his defense that are also paid by family members. Recall that we prefaced our analysis in *Missildine* by noting it was *not* "a case where counsel's fee should reasonably be expected to cover investigative services." 311 N.W.2d at 294. This case picks up where *Missildine* left off. And section 815.1 is the general assembly's answer to that question. Our role is to ensure that answer does not violate Amaya's constitutional rights.

To some extent, section 815.1 follows Justice Uhlenhopp's special concurrence in *Missildine*. Justice Uhlenhopp suggested that before retained counsel was allowed to seek state funding for ancillary services he should be required to "account for the use of his private retainer on the basis of the ordinary and customary charges in the community." *Id.* at 295–96 (Uhlenhopp, J., concurring specially). Section 815.1 requires counsel to account for the funds, but in doing so, limits counsel to a statutory rate—the court-appointed contract rate—to determine counsel's total expected fees instead of his agreed-upon rate. If there are funds available to the retained counsel to cover the ancillary services under the statutory formula, the indigent defendant has funds available for purposes of the statute and is not entitled to seek state funding.

We are unaware of any other case involving a constitutional challenge to a statute like Iowa's. Some states expressly limit state funding for ancillary

services to state-provided attorneys. *See, e.g., People v. Thompson*, 413 P.3d 306, 316–17 (Colo. App. 2017) (relying on Colorado Supreme Court precedent to construe Colorado statutes governing the office of the state public defender collectively to mean that a defendant "only [has] a right to state-funded ancillary services if the public defender or court-appointed alternate defense counsel represented him"); *State v. Earl*, 345 P.3d 1153, 1155 (Utah 2015) (explaining that Utah's public defender statute "generally condition[ed] an indigent defendant's eligibility for [ancillary services] on the retention of publicly funded counsel").

Other state statutes are less explicit, requiring courts to construe whether the statute limits ancillary services to indigent defendants with court-appointed counsel or allows payment for indigent defendants with privately retained counsel. *See, e.g., Tran v. Super. Ct.*, 112 Cal. Rptr. 2d 506, 509–11 (Ct. App. 2001) (considering Cal. Penal Code § 987.9); *State v. Wang*, 92 A.3d 220, 237–40 (Conn. 2014) (considering Conn. Gen. Stat. § 51–292); *Duke v. State*, 856 S.E.2d 250, 256–58 (Ga. 2021) (considering whether Georgia's Indigent Defense Act, which allowed the director to contract with outside consultants as necessary to provide services contemplated by the chapter, applied to services requested by pro bono counsel); *State v. Brown*, 134 P.3d 753, 757–60 (N.M. 2006) (considering whether New Mexico's Indigent Defense Act, which provides "necessary services . . . of representation" to "needy persons" applied to pro bono counsel (omission in original) (quoting N.M. Stat. Ann. § 31–16–3(A))). Where the statute is not clear, some courts have interpreted their state's statutes to allow

state funding for indigent defendants with retained counsel as a matter of statutory construction. *See, e.g., Cannady*, 600 A.2d at 459, 462 (holding that an indigent defendant whose family paid for a private attorney was entitled to have the public defender agency pay for an expert witness because "New Jersey's policy is to provide counsel for all indigent defendants, not just for indigents represented by the [Office of the Public Defender]"); *State v. Wool*, 648 A.2d 655, 658, 660 (Vt. 1994) (holding pro se defendant was entitled to payment of investigative and expert witness services under Vermont's Public Defender Act, explaining that the services are distinct from the state's obligation to provide public representation and cannot be conditioned on accepting court-appointed counsel). Having addressed the right as a statutory matter, these courts did not address whether the services were required as a constitutional matter.

However, courts facing constitutional challenges to their state's rules about ancillary services have been divided over the issue of whether limiting the ancillary services to only state-provided counsel violates an indigent defendant's constitutional rights. The divide turns on the court's determination of whether the constitutional right to ancillary services is tethered to, or severable from, the right to counsel. Courts that conclude the constitutional rights are tethered hold a state may limit access to state funding for ancillary services to indigent defendants represented by state-provided counsel. *See, e.g., Thompson*, 413 P.3d at 318 ("[A] defendant has no Sixth Amendment right to spend *another person's money* for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." (quoting

*Caplin & Drysdale, Charted v. United States*, 491 U.S. 617, 626 (1989))); *Moore v. State*, 889 A.2d 325, 348 (Md. 2005) ("The State satisfied the Due Process Clause, as interpreted in *Ake*, by making expert assistance available to Moore through the [Office of the Public Defender], conditioned on representation by that agency."); *Earl*, 345 P.3d at 1157–58 (recognizing the right to "government-funded defense resources long guaranteed [i]s an adjunct to the right to counsel under the Sixth Amendment" and concluding that a defendant who accepts "the private counsel of her choice . . . has no constitutional right to defense resources from a secondary source backed by government funding"). We have already determined that the right to state-funded ancillary services is distinct from the right to counsel under *Ake* and *Missildine*, so we disagree with those courts' underlying premise. In any event, Iowa's statute allows indigent defendants with retained counsel to receive state funding for ancillary services, so we are faced with a different issue.

Other courts hold a state's funding mechanism that limits ancillary services to court-appointed attorneys is unconstitutional because the rights are related but distinct under *Ake*, so bundling the ancillary services with court-appointed counsel did not satisfy the separate constitutional right. *See, e.g., Wang*, 92 A.3d at 231–32 (holding that a self-represented indigent defendant has a Fourteenth Amendment due process right to publicly funded expert and investigative services, reasoning that "the due process right articulated in *Ake* is not tethered to the right to counsel"); *Duke*, 856 S.E.2d at 256–57 (holding that a Georgia statute allowed pro bono attorneys to contract for ancillary services for

their indigent clients); *id.* at 263 (Peterson, J., concurring) ("*Ake* makes clear that the availability of funding for ancillary defense services involves a right independently rooted in the Due Process Clause."); *Brown*, 134 P.3d at 759–60 ("That right [to ancillary services] is not contingent upon the appointment of Department counsel; it is inherent under the state and federal Constitutions."). These cases involved pro se or pro bono representation, or cases like *Missildine* where there was no question that limited funds provided to counsel would not also cover needed expert fees. The separate issue of whether funds provided to the retained counsel could be expected to cover ancillary services was not at issue.

The case most directly on point that both recognized the right to ancillary services as severable from the right to counsel as a matter of constitutional law and also involved paid retained counsel is *Tran v. Superior Ct.*, 112 Cal. Rptr. 2d 506. There, an indigent defendant's family retained a private attorney to defend his capital murder case for $300,000. *Id.* at 507. The agreement expressly excluded payment of ancillary services, and the retained counsel sought $17,369 in state funding for an investigation, psychological evaluation, interpreter, and transcriber services.[5] *Id.* at 508. The California Court of Appeal rejected the district court's reliance on two out-of-state opinions, including Justice Uhlenhopp's concurrence in *Missildine,* to limit state funding for ancillary

---

[5]California Penal Code section 987.9(a) provided: "In the trial of a capital case . . . the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense."

services based on an "ordinary and customary charges" test. *Id.* at 509–10.[6] The court held that "[r]ote application of an ordinary-and-customary-charges test in cases where retained counsel seeks public funds for ancillary services is bad policy, however, and it is contrary to at least the tone of California precedent." *Id.* at 509–12 (discussing California cases holding that access to ancillary services is afforded to all indigent defendants, not just indigent defendants with appointed counsel, and holding that a family member's agreement with retained counsel that excluded payment of ancillary services precluded the court from considering the third-party payment of attorney's fees in determining indigency).

Amaya makes similar arguments in his challenge to section 815.1's use of the rates paid to court-appointed contract attorneys to determine his eligibility for funding, which is $63 per hour for relevant purposes. Amaya claims that this formula pits his constitutionally protected right to his counsel of choice (when paid by a third party) against his constitutionally protected right to receive ancillary services at state expense, placing him in a Hobson's choice he should not have to make.

To the extent Amaya argues the statute requires his privately retained attorney to adjust his compensation rate to the state contract rate if he is going to receive state funding for his requested investigation and deposition expenses, Amaya's argument fails as a factual matter. Remember our math problems? The statutory scheme reduced Mr. Bergmann's effective rate of $174 per hour to $116

---

[6]The other case, *State ex rel. Rojas v. Wilkes*, 455 S.E.2d 575, 577 (W. Va. 1995), did not involve constitutional claims but only addressed an indigent defendant's right to state-funded ancillary services as a statutory matter under West Virginia Code section 29–21–16(e).

per hour, so almost double the $63 rate paid to court-appointed contract attorneys. While Amaya overstates the effect of the statutory scheme, we nonetheless recognize that it does require Bergmann to work on Amaya's case for less than he agreed. The question is whether that statutory scheme burdens Amaya's competing constitutional rights to a degree that he is denied one or the other.

To the extent Amaya argues he is forced to pick either his counsel of choice or ancillary services needed for his defense, that would be true only if his counsel refuses to represent Amaya if he is required to cover the ancillary expenses out of the funds he has been paid. Again, Amaya's claim fails as a factual matter. There is no evidence that Bergmann has refused to cover the services out of the $15,000 retainer. And as we have shown, requiring the ancillary services to be paid from the retainer still leaves Bergmann with fees at an effective rate of $116 per hour.

The statute does not put Amaya in the place of literally having to choose between his counsel of choice and state funding for ancillary services as is the case under statutory schemes that bundle the provision of ancillary services to state-provided counsel. In *People v. Thompson*, an indigent defendant with privately retained counsel was forced to fire his retained counsel and accept court-appointed counsel to receive needed ancillary services because Colorado's system provided funding for ancillary services only for defendants represented by court-appointed counsel. 413 P.3d at 315–17. The defendant challenged the system as "plac[ing] [him] on the horns of a constitutional dilemma" because he

had to choose between his counsel of choice and the "right to present his defense, via the ancillary services." *Id.* at 316. Here, Amaya can have both his counsel of choice and state-funded ancillary services, although with limits.

From a constitutional perspective, the real issue presented in this case is not whether $63 per hour is a reasonable rate but whether denying state-funded ancillary services if third-party funding could reasonably be expected to cover both the ancillary services and the attorney's fees violates either the right to counsel of choice or to the ancillary services. We could follow the California court's lead and look only to the agreement between the attorney and the third party. But that would not help Amaya since the fee agreement between his mother and Bergmann included an agreement for his mother to pay for ancillary services. So the real issue is whether Justice Uhlenhopp was correct that the Constitution allows the state to require the attorney to account for the third-party funds and use those funds to cover ancillary services to the extent the funds provide the retained attorney a reasonable fee, even if that fee is below the agreed rate.

We agree with Justice Uhlenhopp that funds available to retained counsel by a third party are relevant to the issue of whether an indigent defendant is entitled to state funding for ancillary services as a constitutional matter. We have concluded that the constitutional right to needed ancillary services is distinct from the constitutional right to counsel, but we have also recognized they are related. The constitutional right at issue is the right to put on a defense, and the defendant's attorney is generally the one who is tasked with that job. *Cf. State v.*

*DiFrisco*, 804 A.2d 507, 536 (N.J. 2002) (citing *Cannady*, (which recognized the right to ancillary services is severable from the right to counsel) but rejecting a standalone claim for ineffective assistance of an expert because "the deficient performance that implicates a defendant's right in that respect is the performance of counsel who obtained the expert's examinations or presented the evidence at trial"). Our holding in *Missildine* and the Supreme Court's holding in *Ake* recognize that when a state brings its might against a criminal defendant, the state must provide an indigent defendant with those ancillary services necessary to defend himself. Yet, the right to state-funded ancillary services is not absolute, as is the right to state-funded counsel; it is limited to access to ancillary services reasonably necessary to allow a defendant an adequate opportunity to put on a defense. *See Ake*, 470 U.S. at 77, 83.

*Ake* left to states to determine the best way to provide ancillary services, similar to the way it provides counsel at state expense. *Id.* at 83. With respect to state-funded counsel, the Iowa General Assembly has satisfied that obligation by creating a public defender's office, which is supplemented by court-appointed contract attorneys. *Ake* made a similar point that when ancillary services are provided at state expense, an indigent defendant is not entitled to an expert of his choice, but he is entitled to "access" to necessary ancillary services that give him an "adequate opportunity" to put on his defense. *Ake*, 470 U.S. at 77 (quoting *Moffitt*, 417 U.S. at 612).

To the extent Amaya takes issue with forcing his retained counsel to reduce his agreed-upon rate to the state contract rate before the state will cover

ancillary services, we do not see those limits as materially different from the limits placed on indigent defendants who receive counsel at state expense. Stated differently, we do not see how we can declare the procedure in section 815.1 for determining a reasonable rate unconstitutional without also declaring the use of the $63 per hour rate unconstitutional for all contract attorneys. The general assembly has declared that to be a "reasonable" rate. *See* Iowa Code § 815.7(1), (5) (declaring that contract attorney "shall be entitled to reasonable compensation and expenses" and setting that rate at $63 as relevant here).

Our conclusion that the state is constitutionally permitted to consider the funds available to a retained attorney in determining whether it is required to provide state funding for ancillary services leads us to reject the California Court of Appeal's approach. That court explained its reasoning as follows:

> There are at least two problems if private counsel expects every retainer agreement will be scrutinized under a reasonableness test: (1) it would impinge on the ability of the free market economy to set the price for legal services; and (2) it would deter many of the best, most experienced attorneys from taking privately retained cases without charging for ancillary services. In those cases in which the family could not afford the attorney's fee *and* the cost of ancillary services, the public would end up paying for both instead of just the ancillary services. Moreover, a reasonableness test would interfere with the principle that, when possible, a defendant should be afforded retained counsel of choice.

*Tran,* 112 Cal. Rptr. 2d at 510–11. But these are policy issues best left to the general assembly, not constitutionally-grounded principles we may rely on. Further, they focus on the attorney's rights—rights to set their rates and whether they would be deterred from representing defendants like Amaya. *Cf. Simmons v. State Pub. Def.,* 791 N.W.2d 69, 87 (Iowa 2010) (explaining, in structural

challenge to hard cap on appellate fees for court-appointed counsel, "we focus not on establishing a system that provides reasonable compensation to a lawyer, but on one that is designed to provide effective assistance of counsel"). Those concerns are always at issue when a client seeks the services of an attorney, and nothing about the Sixth Amendment counsel-of-choice jurisprudence requires the state to sweeten the pot to help assure a defendant receives his attorney of choice. *See Luis*, 578 U.S. at 11 (concluding the right to counsel of choice "grants 'a defendant a *fair opportunity* to secure counsel of his own choice'" (emphasis added) (citation omitted) (quoting *Powell*, 287 U.S. at 53)).

Section 815.1 places limits on an indigent defendant's entitlement to state funding for ancillary services needed for his defense, but not unconstitutionally so, at least not on this record. To the extent Amaya relies on *Simmons v. State Public Defender*, there may be a point at which the statutory scheme creates such a chilling effect on attorneys willing to represent indigent defendants that it inhibits a defendant's ability to receive competent representation. *See* 791 N.W.2d at 87–88 (holding "the plaintiff has shown that if Iowa imposes a hard-and-fast fee cap of $1500 in all [appellate] cases, such a fee cap would in many cases substantially undermine the right of indigents to effective assistance of counsel in criminal proceedings under article I, section 10 of the Iowa Constitution" based on the detailed record made in the district court, including a finding that the cap reduced the attorney's effective rate to $12 per hour). The general assembly has declared $63 per hour to be "reasonable compensation" for state-funded contract attorneys. Unless that underlying premise is

satisfactorily challenged, tying state funding for ancillary services provided to retained counsel to that same rate is not a constitutionally impermissible way for the general assembly to determine whether funds paid to a retained attorney could be expected to cover requested ancillary services at state expense.

We hold that the state is not constitutionally required to provide ancillary services to an indigent defendant represented by private counsel if funds available to the counsel can reasonably be expected to cover the services. As *Ake* suggested, the general assembly came up with a process for determining when that can be expected. That process may chill some private attorneys from accepting cases like Amaya's, not unlike the chill caused by paying court-appointed attorneys only $63 (or $68 under the current rates) per hour. But policy arguments similar to those made by Amaya and Chief Justice Christensen's dissent are for the legislature. As long as the statutory rate paid to contract attorneys is not itself unconstitutional, we cannot say the process in section 815.1 relying on that same rate is constitutionally prohibited.

**V. Conclusion.**

The district court's ruling that severed section 815.1(4)(*c*) from the statute is reversed. The case is remanded for further proceedings consistent with this opinion.

**WRIT SUSTAINED.**

Waterman, Mansfield, McDonald, and McDermott, JJ., join this opinion. Christensen, C.J., files an opinion concurring in part and dissenting in part, in which Appel, J., joins. Appel, J., files a dissenting opinion.

**CHRISTENSEN, Chief Justice (concurring in part and dissenting in part).**

I disagree with the majority's resolution of the case because I believe that a district court cannot consider third-party funds used to hire an attorney for an indigent defendant in determining whether "counsel's fee should reasonably be expected to cover investigative services" or ancillary services[7] under *English v. Missildine*, 311 N.W.2d 292, 294 (Iowa 1981).[8] I would strike the portion of Iowa Code section 815.1(4)(*c*) (2019) that requires the court to consider monies paid or to be paid "on behalf of" the indigent defendant in determining whether investigative services should be authorized. Therefore, Rodrigo Amaya should be entitled to the requested investigative services at state expense.

**I. Section 815.1 Violates the Right to Effective Counsel Under the Sixth Amendment to the United States Constitution.**

**A. Application of *Missildine*.** In *Missildine*, we held that "authority for the services requested by plaintiff exists under his Sixth Amendment right to effective representation of counsel. For indigents the right to effective counsel includes the right to public payment for reasonably necessary investigative services." 311 N.W.2d at 293–94. We have since reiterated this principle in multiple cases. *See, e.g., State v. Dahl*, 874 N.W.2d 348, 351–52 (Iowa 2016)

---

[7]The terms "investigative services" and "ancillary services" are used interchangeably throughout this opinion.

[8]I agree with the majority's analysis in part II that the appropriate form of review is a writ of certiorari. Like the majority, I also remain concerned that the fee agreement between Bergmann and Amaya's mother obligates her to pay for the investigative services requested in this case. However, the majority proceeds with the constitutional analysis of section 815.1's statutory formula. Because of the majority's decision, I also address the constitutional issues.

("[T]he Sixth Amendment to the United States Constitution requires the State to pay for reasonably necessary defense services for which indigent defendants demonstrate a need in order to ensure such defendants receive effective assistance of counsel."); *State v. Walters*, 426 N.W.2d 136, 140 (Iowa 1988) ("An indigent's right to effective assistance of counsel includes the right to public payment for reasonably necessary investigative services."). Nevertheless, an individual's right to reasonably necessary investigative services is not absolute under *Missildine*, as an indigent defendant is not entitled to public funding for investigative services if the "accused has rendered himself impecunious by an unreasonable expenditure of funds to retain private counsel" or if "counsel's fee should reasonably be expected to cover investigative services." *Missildine*, 311 N.W.2d at 294. Only the second exception is at issue in this case.

Section 815.1 is the general assembly's attempt to determine whether private "counsel's fee should reasonably be expected to cover investigative services." *Id.*; *see generally* Iowa Code § 815.1. The statute at issue provides that a court cannot grant an application to authorize investigative services unless "[t]he represented person is indigent and unable to pay for the costs sought," "[t]he costs are reasonable and necessary for the representation of the indigent person in a case for which counsel could have been appointed," and "[t]he moneys paid or to be paid to the privately retained attorney *by or on behalf of the indigent person* are insufficient to pay all or a portion of the costs sought to be paid from state funds." *Id.* § 815.1(4)(*a*)–(*c*) (emphasis added).

The majority explains the section's statutory formula implements Justice Uhlenhopp's special concurrence from *Missildine*. *See* 311 N.W.2d at 294–96 (Uhlenhopp, J., concurring specially). Justice Uhlenhopp argued that a defendant with a private attorney retained through a third party who seeks public funds for investigative services "must play according to the rules of the game provided by the General Assembly." *Id.* at 295. He believed that privately retained counsel would have to become court-appointed counsel so that the court-appointed statutory rate could substitute private counsel's fee. At the time, the district court determined the statutory rate based on a variety of factors, *id.* (citing Iowa Code § 815.7 (1981)); *see Parrish v. Denato*, 262 N.W.2d 281, 285 (Iowa 1978) (providing a list of factors to determine an appropriate statutory rate), and only defendants whose attorneys exhausted the retainer fees under the statutory rate could access investigative services at state expense, *Missildine*, 311 N.W.2d at 295. Today's section 815.1's statutory formula uses section 815.7's current court-appointed hourly rates to determine whether an attorney has exhausted their retainer fee instead of Justice Uhlenhopp's advocacy for the court to determine "ordinary and customary charges for like services in the community" under a previous version of section 815.7. *Id.* (quoting Iowa Code § 815.7 (1981)); *see* Iowa Code § 815.1, .7 (2019).

But none of the other justices in *Missildine* joined Justice Uhlenhopp's argument to consider third-party funds in determining whether "counsel's fee should reasonably be expected to cover investigative services." *Missildine*, 311 N.W.2d at 294 (majority opinion). Rather, they held that "the Constitution

independently mandates judicial recognition of an indigent's right to necessary investigative services." *Id.* This is because "[t]he fact that a third person retained private counsel for [the defendant] does not by itself affect his status as an indigent." *Id.* (citing *Schmdit v. Uhlenhopp*, 140 N.W.2d 118 (Iowa 1966)). Our courts have historically recognized that third-party funds are irrelevant to determining if the defendant is indigent. *See Schmidt*, 140 N.W.2d at 119–21 (holding that the defendant's mother's payment for a private attorney had no effect as to whether the defendant is indigent); *cf. State v. Van Gorder*, 184 N.W. 638, 639 (Iowa 1921) ("The fact the [defendant] was able to furnish an appeal bond, or that his wife has an interest in her father's estate, or that the [defendant] has brothers and sisters and other relatives in Allamakee [C]ounty, Iowa, who had previously come to his aid, is not a sufficient reason why he should be denied a transcript at the expense of the [state], as he has no legal way of securing any funds from these sources with which to pay for a transcript."); *State v. Wright*, 82 N.W. 1013, 1014 (Iowa 1900) ("While a moral obligation may require relatives to assist one another in such cases, we know of no legal rule requiring it, where, as in this case, the defendant is an adult.").

*Missildine* then explained that "the sixth amendment provides authority for furnishing investigative services to indigents at public expense *without regard to* whether the indigent is represented by counsel at public expense." 311 N.W.2d at 294 (emphasis added). I read this holding to mean that, as a constitutional matter, the existence of third-party funds are irrelevant in determining whether an indigent defendant should have access to reasonably necessary investigative

services. This reasoning is consistent with other state courts. *See State v. Jones*, 707 So. 2d 975, 977 (La. 1998) ("The presence of retained counsel, be it from a collateral source or pro bono, should not work [as] a hardship against an indigent accused who otherwise would be entitled to State funded auxiliary services. The determinative question is the defendant's indigency, not whether he has derived any assistance from collateral sources."); *State ex rel. Rojas v. Wilkes*, 455 S.E.2d 575, 577 (W. Va. 1995) ("We disagree with the respondent's contention that the funds with which the petitioner's family retained private counsel are relevant to petitioner's right as an indigent person to have necessary expert assistance provided at the State's expense. The petitioner's family members have no obligation to finance the petitioner's defense, and any funds they provide have no effect on his status as personally indigent."); *see also Brown v. Eighth Jud. Dist. Ct.*, 415 P.3d 7, 10–11 (Nev. 2017) (collecting cases). Section 815.1's statutory formula has effectively conditioned an indigent's access to reasonably necessary services and effective assistance of counsel on irrelevant third-party funds. That is contrary to *Missildine* and in violation of the Sixth Amendment to the United States Constitution.

In finding a violation has occurred under *Missildine*, I must determine whether severance of section 815.1 is appropriate. *See Westco Agronomy Co. v. Wollesen*, 909 N.W.2d 212, 224 (Iowa 2017) ("Severance is appropriate 'if it does not substantially impair legislative purpose, the enactment remains capable of fulfilling the apparent legislative intent, and the remaining portion of the enactment can be given effect without the invalid provision.' " (quoting *Breeden*

*v. Iowa Dep't of Corr.*, 887 N.W.2d 602, 608 (Iowa 2016))). While the district court correctly understood that third-party funds cannot be taken into consideration, it severed the wrong portion of the statute. Instead of severing the portion of the formula that required replacing the privately retained attorney fees with section 815.7 rates, I would sever the portion referring to monies paid or to be paid "on behalf of" the indigent defendant. *See* Iowa Code § 815.1(4)(*c*); *id.* § 815.1(4)(*c*)(2). Section 815.1(4)(*c*) would then logically read: "The moneys paid or to be paid to the privately retained attorney *by the indigent person* are insufficient to pay all or a portion of the costs sought to be paid from state funds."[9]

Here, the record shows Amaya has not provided any money or indicated that he will be able to pay his attorney Benjamin Bergmann or Bergmann's firm any money to go toward his defense. Regardless of whether we apply Bergmann's contracted rate or statutorily prescribed rate under section 815.7, under my analysis the monies paid or to be paid by the indigent person are insufficient to cover the costs. Because both parties agree that the defendant is indigent and that the investigative services are reasonably necessary, I would have granted those services at state expense and stopped short of determining whether section 815.7 rates can be used in calculating whether a defendant who hires private counsel and then cannot pay for reasonably necessary investigative services.

---

[9]Subsequently, section 815.1(4)(*c*)(2) would also read "If the product calculated in subparagraph (1) is greater than the monies paid or to be paid to the attorney *by the indigent person*, the monies shall be considered insufficient to pay all or a portion of the costs from state funds."

**B. Reevaluating the Math.** In holding that the statute is constitutional under this as-applied challenge, the majority offers mathematical illustrations to provide some perspective on the operation of section 815.1. These illustrations show that Bergmann does not expect to receive full payment for his contracted $300 hourly rate with the initial retainer of $15,000. Using only Bergmann's projected 86.1 hours and excluding any hours by his associates, the majority suggests he would earn $174 per hour if ancillary services are not covered from the initial retainer and $116 per hour if ancillary services are covered from the initial retainer.

Two other associate attorneys working for Bergmann completed 58.8 hours before the filing of the motion for investigative services. The State Public Defender's Office (SPD) objected to the use of any of their hours in the section 815.1 statutory formula because section 815.1 refers to a singular attorney. *See* Iowa Code § 815.1(1) (referring to only "a privately retained attorney"), (2)(*a*) (requiring the "number of hours of work completed by the attorney to date" as part of the application for funds). Ultimately, the district court did not include the associates' hours because it determined a constitutional violation existed without them.

The SPD's proposed interpretation creates practical problems. There is nothing in the record to indicate that the associates' hours were unnecessary to build Amaya's defense. If the associates could not perform that work, it would

have been left to Bergmann to complete that work at a much higher hourly rate.[10] Section 815.1(4)(*c*)(1)'s statutory formula should include hours that are reasonably necessary to building a defense for purposes of determining whether ancillary funds are available, regardless of the number of attorneys working on the case. *See id.* § 4.1(17) ("Unless otherwise specifically provided by law the singular includes the plural, and the plural includes the singular."). Otherwise, the result is a grossly inaccurate reflection of the true legal work performed in determining whether the attorney or law firm has exhausted the retainer, i.e. whether "counsel's fee should reasonably be expected to cover investigative services." *Missildine,* 311 N.W.2d at 294. Assuming all of the associates' legal work was necessary, I would include their hours in calculating total fees.

Based on the section 815(4)(*c*)(1) formula including the associates' hours, Bergmann and the firm could expect to receive an hourly rate of approximately $104[11] if the ancillary services were not used from the retainer and an hourly rate of $69[12] if the ancillary services were used from the retainer. This result paints a drastically different picture than the one the majority depicts. Even if we subtract those ancillary services on the high end from the initial retainer, there is less than ten bucks difference between Bergmann's calculated hourly rate of $69 and the 2019 court-appointed hourly rate of $63. *See* Iowa Code §

---

[10]The fee arrangement between Amaya's mother and Bergmann provides that as lead attorney, Bergmann would work at an hourly rate of $300 while associates would work at an hourly rate of $150 to $300. The district court noted that one associate worked at an hourly rate of $250 and the other worked at an hourly rate of $200.

[11]$15,000 divided by 144.9 hours.

[12]$10,000 divided by 144.9 hours.

815.7(5). If Bergmann worked sixteen additional hours, his hourly rate would $62[13], just below the court-appointed hourly rate.

Another fact pattern that could easily occur is if Amaya's mother had advanced $1,000 less and the retainer was used for the ancillary services. This would also result in Bergmann's hourly rate becoming $62,[14] just below the same court-appointed hourly rate. It is important to note that these calculations do not consider any necessary overhead charges that must be pulled from the retainer. *Cf. Simmons v. State Pub. Def.*, 791 N.W.2d 69, 73 (Iowa 2010). Taking these scenarios into consideration, it is easy to assume that other privately retained attorneys may be in a situation in which the statute does indeed force them into a situation where they are working below the contractual rate. Aimee Kumer, *Reconsidering* Ake v. Oklahoma*: What Ancillary Defense Services Must States Provide to Indigent Defendants Represented by Private or Pro Bono Counsel?*, 18 Temp. Pol. & C.R. L. Rev. 783, 786 (2009) [hereinafter Kumer] ("Where defendants are able to retain an attorney or receive assistance from friends and family in doing so, the likelihood that such attorneys, often inadequately compensated, will be able to render competent representation is substantially increased if the attorneys can access state funds for experts and other services."). If that is the case, an as-applied challenge would certainly look different under a section 815.1 analysis.

---

[13]$10,000 divided by 160.9 hours.

[14]$9,000 divided by 144.9 hours.

As a policy matter, *Missildine* also noted that "[i]t would be strange if the Constitution required the government to furnish both counsel and investigative services in cases where the indigent needs and requests public payment for only investigative services." 311 N.W.2d at 294. Indeed, the result of this case is strange. Bergmann and his associates have provided at least $9,128[15] in legal fees—a significant amount of money the state did not have to pay because it was covered by a third party. The practical effect of section 815.1 is that it will likely "impose an unreasonable and unnecessary additional burden on the public treasury." *Id.*; *see State v. Punsalan,* 133 P.3d 934, 936 (Wash. 2006) (en banc) (explaining that providing state-funded investigative services to indigent criminal defendants with privately funded counsel poses little risk of abuse, supports the right to choice of counsel, and conserves state resources); Kumer, 18 Temp. Pol. & C.R. L. Rev. at 786 ("[I]f a state provides funds for necessary ancillary services, 'it will also encourage more defendants who can pay for counsel themselves or find others to pay for counsel to access retained counsel and free up state resources for defender services.'" (quoting Edward C. Monahan & James J. Clark, Ky. Dep't of Pub. Advoc., *Funds for Resources for Indigent Defendants Represented by Retained Counsel, in Funds for Experts and Resources Manual* 45 (Edward C. Monahan ed., 6th ed. 1999–2001))).

---

[15]$63 multiplied by 144.9 hours.

**II. Conclusion.**

Using third-party funds to determine whether an indigent defendant should have access to reasonably necessary investigative services violates the central holding of *Missildine* and thus the Sixth Amendment. In determining whether an indigent defendant with privately retained counsel should have access to reasonably necessary investigative services, I would sever any reference to monies paid or to be paid "on behalf of" the indigent defendant. Therefore, I would affirm the district court.

Appel, J., joins this concurrence in part and dissent in part.

**APPEL, Justice (dissenting).**

I fully join Chief Justice Christensen's opinion. I write separately to stress that the decision of the court today does not hold that the general assembly's current hourly rates for court-appointed attorneys are consistent with the protections under article I, section 10 of the Iowa Constitution and the Sixth Amendment to the United States Constitution. *See Simmons v. State Pub. Def.*, 791 N.W.2d 69, 76 (Iowa 2010). The majority does not opine on the question of whether the general assembly's declared court-appointed hourly rates are, in fact, "reasonable" and thus consistent with the right to counsel under article I, section 10 or the Sixth Amendment. That question remains open.

I do note, however, that "the state has an affirmative obligation to establish a system of indigent defense that is reasonably likely to provide for zealous advocacy on behalf of the criminal defendant." *Id.* Under this obligation, a court-appointed attorney for an indigent defendant is entitled to reasonable attorney fees from the state. *Id.* at 82. Our court has recognized this obligation since the early 1850s. *See Hall v. Washington County*, 2 Greene 473, 476 (Iowa 1850) ("Where an act of service is performed in obedience to direct mandate of statutory law, under the direction of a tribunal to which the enforcement of that law is committed, reasonable compensation to the person who performs that service is a necessary incident; otherwise, the arm of the law will be too short to accomplish its designs.").

When the "state's method of providing counsel to indigent defendants does not adequately ensure effective assistance of counsel[,] [it] is often referred to as a systemic or structural challenge." *Simmons*, 791 N.W.2d at 76. In such challenges, we are typically concerned with "whether the state has provided an adequate framework for ensuring that the right to counsel is realized in cases involving indigent defense." *Id.*

One notable theme of structural challenges to indigent defense compensation systems is the "linkage between compensation and the provision of effective assistance of counsel." *Id.* at 81–82 (collecting cases). We have noted that the intersection between 815.7's guarantee of a " 'reasonable fee' and the constitutional requirements of effective assistance of counsel are related but not identical." *Id.* at 87. However, the level of compensation remains an important factor in determining whether the structure "substantially undermine[s] the right of indigents to effective assistance of counsel in criminal proceedings under article I, section 10." *Id.*

"Several principal methods have been used throughout the country for valuing legal defense services: flat rates for various kinds of cases; fees set by the court within stated limits; hourly rates; and discretionary fees set by the courts." *Coonrad v. Van Metre*, 362 N.W.2d 197, 203 (Iowa 1985) (en banc) (Uhlenhopp, J., dissenting). A historical overview of Iowa's statutes indicates that

the general assembly has used several valuation methods over the past 170 years.[16]

---

[16]In light of *Hall v. Washington County*, the Iowa General Assembly provided compensation for court-appointed attorneys for the defense of indigent persons in 1851. *State v. Froah*, 263 N.W. 525, 528 (Iowa 1935). This first statute provided flat rates for court-appointed attorneys depending on the type of charge: $25 for the defense of a murder charge, $10 for the defense of other felonies, and $5 for the defense of misdemeanors. Iowa Code § 2561 (1851); *see* Iowa Code § 4168 (1860) (same). In cases that involved an appeal, the courts could provide an enlarged compensation based on a graduated scale corresponding to the flat rates. Iowa Code § 2562 (1851); *see, e.g.*, *Baylies v. Polk County*, 12 N.W. 311, 311–12 (Iowa 1882) (providing a rate two-and-a-half times more than the appointed rate after the appeal).

In 1873, the Iowa Code was changed to allow the court to fix attorney fees for the defense of murders and felonies but kept a rate of $5 for the defense of misdemeanors. Iowa Code § 3829 (1873). But the 1880 the Iowa Code reinstated the same flat rates from 1851. Iowa Code § 3829 (1880); Iowa Code § 3829 (1888) (same as 1880). That flat rate scheme continued until the 1897 Iowa Code, when the general assembly modified the Iowa Code to provide $20 per day for the defense of homicide or other crimes that could be punished by life imprisonment, $10 in total for the defense of other felonies, and provided no provision for misdemeanors. Iowa Code § 5314 (1897). No change occurred in the Iowa Code from 1897 through 1958. Iowa Code § 9375 (1919) (same as 1897); Iowa Code § 13774 (1924) (same); Iowa Code § 13774 (1927) (same); Iowa Code § 13774 (1931) (same); Iowa Code § 13774 (1935) (same); Iowa Code § 13774 (1939) (same); Iowa Code § 775.5 (1946) (same); Iowa Code § 775.5 (1950) (same); Iowa Code § 775.5 (1954) (same); Iowa Code § 775.5 (1958) (same).

In 1959, the general assembly finally increased the longstanding flat rates for court-appointed counsel. *Furey v. Crawford County*, 208 N.W.2d 15, 19 (Iowa 1973) (citing 1959 Iowa Acts ch. 376, § 1 (codified at Iowa Code § 775.5 (1960))). The general assembly increased the flat rate to $50 per day for homicide and life imprisonment cases and $25 in total for other felony cases. *Id.* It also added a section for $15 in total for indicatable misdemeanors. *Id.* An exception for each rate existed where the court could provide additional sums if they were "necessary in the interest of justice." *Id.* at 19; *see* 1959 Iowa Acts ch. 376, § 1 (codified at Iowa Code § 775.5 (1960)).

"Then in 1965 the legislature enacted . . . [section] 755.5 placing determination of reasonable compensation totally within trial court's discretion, free from legislative strictures." *Furey*, 208 N.W.2d at 19 (citing 1965 Iowa Acts ch. 449, § 1 (codified at Iowa Code § 775.5 (1966))). That system remained in place until 1997. Iowa Code § 775.5 (1971) (same as 1966); Iowa Code § 775.5 (1973) (same); Iowa Code § 775.5 (1975) (same); Iowa Code § 775.5 (1977) (same); 1976 Iowa Acts ch. 1245, § 1507 (codified at Iowa Code § 815.7 (1979)) (adding the requirement that "reasonable compensation which shall be the ordinary and customary charges for like services in the community"); Iowa Code § 815.7 (1981) (same as 1979); Iowa Code § 815.7 (1983) (same); Iowa Code § 815.7 (1985) (same); Iowa Code § 815.7 (1987) (same); Iowa Code § 815.7 (1989) (same); Iowa Code § 815.7 (1991) (same); Iowa Code § 815.7 (1993) (same); Iowa Code § 815.7 (1995) (same). In 1997, the general assembly changed the statute so that the reasonable fee of a court-appointed attorney was capped to what a contract attorney under section 13B.4 would receive, but the determination of a reasonable fee remained with the courts. *See* Iowa Code § 815.7 (1997); Iowa Code § 815.7 (1999) (same as 1997).

In 2000, the general assembly once again took control of the fees for court-appointed attorneys by setting a "reasonable" hourly rate. *See* 2000 Iowa Acts ch. 1115, § 10 (codified at Iowa Code § 815.7 (2001)). Instead of a flat rate or a daily rate, the general assembly opted for an hourly rate across different categories of crimes. *Id.* Class "A" felonies received $60 an hour,

We have previously raised concerns about the strict adherence to a fixed hourly rate when our district courts defaulted to suggested hourly rates between 1965 to 1997. "Adherence to a fixed hourly rate, especially if it is low, is a step backwards and defeats the purpose of section 815.7." *Id.* at 201 (Schultz, J., concurring specially).

> Although we recognize the convenience of a fixed rate of compensation based on time expended, a rigid adherence to that method of valuation ignores the other factors which must be considered in determining reasonable compensation. True uniformity in compensation can be achieved only when all of the variables affecting reasonableness are considered.

*Hulse v. Wifvat*, 306 N.W.2d 707, 712 (Iowa 1981) (en banc). "Flat hourly rates do not take into account such factors as the difficulty of issues, the responsibility assumed, and the experience of the attorney." *Coonrad*, 362 N.W.2d at 201. These variations include "the nature and extent of the service, the amount involved (or, as here, the possible punishment involved), the difficulty of handling and importance of issues, responsibility assumed and the results obtained, as well as the standing and experience of the attorney in the profession should be

---

class "B" felonies received $55 an hour, and all other cases were at $50 an hour. *Id.* That rate has slowly crawled upward over the past twenty years. 2006 Iowa Acts ch. 1166, § 9 (codified at Iowa Code § 815.7 (2007)) (providing for appointments made after July 1, 2006, $65 an hour for class "A" felonies, $60 an hour for all other felonies and misdemeanors, $55 an hour for all other cases); 2007 Iowa Acts ch. 213, § 25 (codified at Iowa Code § 815.7(4) (2008)) (providing for appointments made after July 1, 2007, $70 an hour for class "A" felonies, $65 an hour for class "B" felonies, $60 an hour for all other cases); 2019 Iowa Acts ch. 163, § 35 (codified at Iowa Code § 815.7(5) (2020)) (providing for appointments made after July 1, 2019, $73 an hour for class "A" felonies, $68 an hour for class "B" felonies, $63 an hour for all other cases); 2021 Iowa Acts ch. 166, § 24 (codified at Iowa Code § 815.7(6) (2022)) (providing for appointments made after July 1, 2021, $76 an hour for class "A" felonies, $71 an hour for class "B" felonies, $66 an hour for all other cases). On June 17, 2022, shortly before this opinion was filed, House Bill 2559 was signed into law by the Governor. H.F. 2559, 89th G.A., Reg. Sess. § 21 (Iowa 2022). This bill minimally increases the hourly rates for court-appointed attorneys yet again (raising rates by two dollars in each category). *See id.*

considered." *Parrish v. Denato*, 262 N.W.2d 281, 285 (Iowa 1978) (quoting *Gabel v. Gabel*, 117 N.W.2d 501, 503 (Iowa 1962)). These variations are particularly true in evaluating the going rates for privately retained criminal counsel such as the defense counsel for Rodrigo Amaya in this case.

Moreover, statutorily imposed hourly rates typically do not adjust for the basic principle of inflation. For example, for class "A" felonies, the general assembly declared $60 as a reasonable hourly rate in 1999,[17] and $76 as a reasonable hourly rate in 2022.[18] But $60 in 1999 is worth around $105 in 2022.[19] The current hourly rate of $76 does not come close to that amount. So, assuming that the general assembly's declaration of hourly rates for 1999 was reasonable in 1999, one might question whether the general assembly's current hourly rates are reasonable for 2022. *See Smith v. State*, 394 A.2d 834, 838 (N.H. 1978) ("Yet, inflation *alone* has reduced the hourly rates . . . . There can be no question that by limiting an attorney's compensation . . . the State has transferred a major part of its own burden onto the shoulders of the New Hampshire bar" (emphasis added) (citation omitted)).

The general assembly can set rates for court-appointed attorneys representing indigent defendants. *Samuels v. County of Dubuque*, 13 Iowa 536,

---

[17] 1999 Iowa Acts ch. 135, § 26 (codified at Iowa Code § 815.7 (2001)) ("For appointments made on or after July 1, 1999, the reasonable compensation shall be calculated on the basis of sixty dollars per hour for class 'A' felonies . . . .").

[18] 2021 Iowa Acts ch. 166, § 24 (codified at Iowa Code § 815.7(6) (2022)) ("For appointments made on or after July 1, 2021, the reasonable compensation shall be calculated on the basis of seventy-six dollars per hour for class 'A' felonies . . . .").

[19] *See $60 in 1999 is Worth $105.27 Today*, CPI Inflation Calculator, https://www.officialdata.org/us/inflation/1999?amount=60 [https://perma.cc/SV7A-W7ZA] (last visited June 21, 2022).

537–38 (1862). But what these fee-setting statutes *cannot* do is "have a substantial chilling effect on the constitutional rights of criminal defendants." *Simmons*, 791 N.W.2d at 85. We mapped out the negative effects of a hard cap for court-appointed attorneys in *Simmons v. State Public Defender. Id.* at 87–88. These negative effects included restricting the pool of attorneys willing to represent indigent defendants, the level of quality of attorneys, and pitting the attorney's economic interests against the client's interest. *Id.* at 88. These concerns apply just as much to fixed hourly rates.

But as the majority properly observed, we are not currently in a position to analyze whether the hourly rate is low enough to create a structural violation of article I, section 10 of the Iowa Constitution, or the Sixth Amendment to the United States Constitution. Any claim that fee payments amount to a structural error must await a direct attack supported by a detailed record which could include, among other things, the current caseloads of court-appointed attorneys, recommended ethical standards for court-appointed attorneys, relevant overhead charges (including mileage), the effect of the hourly cap under Iowa Administrative Code rule 493—12.6(4) (2021), the performance of attorneys engaging in representation through court appointment, and reasonable rates among criminal attorneys practicing in Iowa.

In my view, the judiciary has the responsibility to ensure that criminal defendants are adequately represented. Adhering to that premise, some courts have indicated that courts could order increased funding or increased compensation for indigent defense in lieu of legislative actions. *See State v.*

*Quitman County*, 807 So. 2d 401, 409–10 (Miss. 2001) (en banc) ("Though questions of [allocating funds for indigent defense] are traditionally legislative affairs, this Court has recognized that where the Legislature fails to act, the courts have the authority and the duty to intervene."); *State v. Lynch*, 796 P.2d 1150, 1161 (Okla. 1990) ("Although we invite legislative attention to this problem, in the interim, we must establish guides which will apply uniformly without either violating due process rights or granting constitutional immunites."). A significant body of academic commentary has arisen supporting structural litigation. *See* Cara H. Drinan, *The Third Generation of Indigent Defense Litigation*, 33 N.Y.U. Rev. L. & Soc. Change 427, 432–39 (2009) (describing efforts made on the state level to employ a new model of structural litigation to address the issue of indigent defense representation); *see generally* Note, Gideon*'s Promise Unfulfilled: The Need for Litigated Reform of Indigent Defense*, 113 Harv. L. Rev. 2062 (2000) (same); Rodger Citron, *(Un)*Luckey v. Miller*: The Case for a Structural Injunction to Improve Indigent Defense Services*, 101 Yale L.J. 481 (1991) (same). And, as experts, we know that the fee levels for indigent defense are very low. *See State v. See*, 387 N.W.2d 583, 586 (Iowa 1986). But because of the narrow nature of the claim and the facts presented, this case is not the vehicle to consider structural reform.